**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

SEDRIC L. ANDERSON
ADC #133122                                                                    PETITIONER


VS.                                  5:11CV00236 KGB/JTR


RAY HOBBS, Director,
Arkansas Department of Correction                                   RESPONDENT

<u>**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**</u>

<u>**INSTRUCTIONS**</u>

The following recommended disposition has been sent to United States District Judge Kristine G. Baker. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the United States District Judge, you must, at the same time that you file your written objections, include a "Statement of Necessity" that sets forth the following:

1.     Why the record made before the Magistrate Judge is inadequate.

2.     Why the evidence to be proffered at the requested hearing before the United States District Judge was not offered at the hearing before the Magistrate Judge.

3.     An offer of proof setting forth the details of any testimony or other evidence (including copies of any documents) desired to be introduced at the requested hearing before the United States District Judge.

From this submission, the United States District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Room A149
Little Rock, AR 72201

## I. Background

Pending before the Court is a § 2254 Petition for a Writ of Habeas Corpus filed by Petitioner, Sedric L. Anderson. Before addressing Petitioner's habeas claims, the Court will review the procedural history of the case in state court.

On March 11, 2005, a Craighead County jury convicted Petitioner of: (1) manufacturing methamphetamine; (2) possession of drug paraphernalia with the intent to manufacture methamphetamine; (3) possession of pseudoephedrine with the intent to manufacture methamphetamine; and (4) possession of anhydrous ammonia in an unlawful container. *Docket entry #9-2*. He received an aggregate sentence of 120 months in the ADC.[1] *Docket entry #9-2*.

During Petitioner's trial, the prosecution relied on strong circumstantial evidence, and Petitioner's statements, to establish his guilt:

> [A] deputy was driving near a store, the B&L Quick Mart in Jonesboro, when he noticed the strong odor of chemicals typically used in the manufacture of methamphetamine. At the back of the store, the officer found a parked truck that was registered to [Petitioner]. Other officers located an air tank in the vicinity of appellant's truck. The tank, which smelled strongly of a chemical, had been converted with odd fittings and plastic pipe. There was testimony that the officers had seen similar air tanks that were converted to hold anhydrous ammonia, a chemical used in the production of methamphetamine. As the officers approached a padlocked shop building adjacent to the store, they noted an even stronger odor of anhydrous ammonia emanating from it. Several other

---

[1] Petitioner remained free on bond until the conclusion of his direct appeal. After the mandate issued in his direct appeal, Petitioner self-reported to the ADC on February of 2008. *Rule 37 Tr. at 138*. It appears that Petitioner was paroled from the ADC in October of 2012. *Docket entry #15*. The Court has been informed by Petitioner's state parole officer that Petitioner will remain on parole until 2018.

At the time Petitioner initiated this action in 2011, he was incarcerated in the ADC. *Docket entry #2 at 1*. Because he remains subject to parole supervision on his underlying conviction and sentence, the Court retains habeas jurisdiction. *See Gentry v. Landsown*, 175 F.3d 1082, 1083 (8th Cir. 1999) ("[Petitioner] was released on parole before oral argument in this court, but his federal habeas petition is not moot because he remains subject to parole restrictions and in the legal custody of the Missouri Department of Corrections until the expiration of his sentence."); *Thompson v. McKune*, 516 Fed. Appx. 711 n.1 (10th Cir. 2013) ("After filing his federal habeas petition, Petitioner was released from prison on parole. His status as a parolee is sufficient to render him 'in custody' for purposes of 28 U.S.C. § 2254."); *Akrawi v. Booker*, 572 F.3d 252, 255 n.1 (6th Cir. 2009) ("[Petitioner's] release from imprisonment does not affect his entitlement to seek habeas relief because (1) his incarceration at the time he filed his habeas petition satisfies the "in custody" requirement; and (2) a parolee is still 'in custody' for habeas purposes.").

3

officers arrived to investigate and permission was obtained from the owner of the store to cut the padlock on the shop. A methamphetamine lab was located inside. Assorted paraphernalia used in methamphetamine production was also found in the store to which [Petitioner] admitted having a key.

Some hours after the first officer had come to the scene, [Petitioner] emerged from the store. After he was advised of his right against self-incrimination, he admitted that he had secured a cover on a large bucket that contained substances undergoing chemical reactions in the early stages of methamphetamine production and poured out a bag of powder and put in lithium strips used in the process of manufacturing methamphetamine. He further answered questions concerning the point at which the chemical reaction was expected to stop, the color of the chemical reaction, and the number of ounces of methamphetamine expected to be derived from the process. He also said that he always wore rubber gloves and a mask during the manufacture of the drug. No one else was inside the store or shop when [Petitioner] emerged from the store.

*Anderson v. State*, 2010 Ark. 404, 373 S.W.3d 876 (2010).

After his conviction, Petitioner appealed to the Arkansas Court of Appeals. He argued that: (1) the evidence was insufficient to support his conviction for the manufacture of methamphetamine; (2) the trial court erred in denying his motion to suppress his statement to the police; and (3) the trial court erred in denying his motion to suppress evidence based on spoliation. On September 26, 2007, the Arkansas Court of Appeals affirmed. *Anderson v. State*, 2007 WL 2782556 (Ark. Ct. App. 2007).

On February 19, 2008, Petitioner filed a Rule 37 Petition in Craighead County Circuit Court, raising numerous ineffective assistance of counsel claims.[2] *Rule 37 Tr. at 158-163, 195-206*. On April 28 and 29, 2008, the trial court conducted an evidentiary hearing. *Rule 37 Tr. at 235-427*. On June 2, 2008, the trial court entered an Order denying Rule 37 relief. *Rule 37 Tr. at 228*.

Petitioner appealed the denial of Rule 37 relief to the Arkansas Supreme Court, which affirmed on October 28, 2010. *Anderson v. State*, 2010 Ark. 404, 373 S.W.3d 876 (Ark. 2010).

Petitioner initiated this *pro se* habeas action on September 8, 2011. *Docket entry #2*. In his Petition, he argues that: (1) his trial lawyer provided ineffective assistance of counsel; (2) the trial court erred in denying his motion to suppress; and (3) his convictions violate the Double Jeopardy Clause. *Docket entry #2*. Respondent argues that Petitioner's claims are either procedurally defaulted or fail on the merits. *Docket entry #9*.

For the reasons discussed below, the Court concludes that all of Petitioner's claims are either without merit or are procedurally defaulted. Accordingly, it recommends that the Petition be denied and the case dismissed, with prejudice.

---

[2] Petitioner first filed a *pro se* Rule 37 Petition, but later hired lawyers who amended his Petition and represented him at the Rule 37 hearing and appeal.

## II. Discussion

### A. Standard of Review for Habeas Corpus Relief Under the Antiterrorism and Effective Death Penalty Act ("AEDPA")

A federal court will not grant habeas relief unless a state court's decision "was contrary to, or involved an unreasonable application of, clearly established federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

A state court decision is "contrary to" clearly established federal law if it reaches a conclusion opposite that of the Supreme Court on a question of law, or reaches a decision contrary to the Supreme Court on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision involves an "unreasonable application" of federal law when it identifies the correct legal rule, but unreasonably applies it to the facts. *Id.* at 407. "A state court's application of clearly established federal law must be objectively unreasonable, not merely incorrect, to warrant the granting of a writ of habeas corpus." *Jackson v. Norris*, 651 F.3d 923, 925 (8th Cir. 2011).

Finally, the state court's findings of fact are presumptively correct, and the habeas petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Stenhouse v. Hobbs*, 631 F.3d 888, 891 (8th Cir. 2011) (quoting 28 U.S.C. § 2254(e)(1)).

6

### B.     Analysis of Petitioner's Habeas Claims

### 1.     Ineffective Assistance of Counsel Claim

First, Petitioner argues that his trial lawyer was ineffective for failing to "subpoena information" about the two men who owned the premises where the meth lab was located. According to Petitioner, evidence about the owners' prior arrests and convictions for drug crimes could have been used at trial "to focus on the owners of B&L since possession is 9/10 of the law." *Docket entry #2 at 4*. He also argues that his lawyer should have subpoenaed the owners to testify at trial because they would have exonerated him.[3] *Docket entry #2 at 4-5*.

In Petitioner's Rule 37 appeal, the Arkansas Supreme Court properly applied the ineffective-assistance standard established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984),[4] and concluded that trial counsel was not "constitutionally ineffective" in the way he dealt with the issues surrounding the store owners' potential involvement in the crime:

> [Petitioner] asserts that counsel could have subpoenaed information concerning the other two men's prior arrests and convictions and introduced it at trial to focus the jury's attention on those two men as the real drug manufacturers. He contends that the men could have been called by the defense to testify as to the reason [Petitioner] was at the store and the extent of his relationship with them. [Petitioner] does not explain specifically what the men would have said as to the

---

[3] At a pretrial suppression hearing, the store owners were subpoenaed to testify but they invoked their Fifth Amendment privilege and did not answer any questions. *Trial Tr. at 22-28*.

[4] To prevail on a claim of ineffective assistance of counsel, the petitioner must show that counsel's representation fell below an objective standard of reasonableness, and that, but for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984).

reason he was at the store or the nature of the relationship between them. [Petitioner] makes much on appeal of the fact that he was not the owner of the property where the methamphetamine lab was found. He failed to demonstrate in the petitions for postconviction relief, however, that the mere fact that other persons may also have had culpability in the matter relieved him of culpability.

Considering the totality of the evidence that established that [Petitioner] admitted to taping up the bucket containing a chemical used to make methamphetamine, admitted to handling drug paraphernalia, answered questions concerning the manufacturing process, and was found alone in the midst of drug paraphernalia while methamphetamine was being manufactured in an adjacent shop, whatever reason the men may have had for appellant's presence at the store would have been unlikely to produce a different outcome in the trial. As the court of appeals noted on direct appeal: Neither exclusive nor physical possession is necessary to sustain a charge if the place where the offending substance is found is under the dominion and control of the accused. Put in other terms, the State need not prove that the accused had actual possession of a controlled substance; constructive possession is sufficient. Constructive possession can be implied where the contraband is found in a place immediately and exclusively accessible to the accused and subject to his control. (Citations omitted.)

With respect to the men's prior arrests, bad acts, or convictions, appellant does not state under what legal precedent the character and conduct of the men would have been admissible at appellant's trial. He fell far short of establishing that there was some specific admissible evidence concerning the two men that counsel could have presented to the jury. Moreover, there was testimony concerning the close association of the men with appellant and testimony that he was in possession of a key to the store. Under these circumstances, the decision of counsel not to paint the men in a negative light by revealing their nefarious backgrounds may well have been a matter of trial strategy on counsel's part. Where a decision by counsel was a matter of trial tactics or strategy, and that decision is supported by reasonable professional judgment, then such a decision is not a proper basis for relief under Rule 37.1.

*Anderson*, 373 S.W.3d at 881-882.

"Taken together, AEDPA and *Strickland* establish a 'doubly deferential standard' of review." *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (*quoting Cullen v. Pinholster*, 131 S. Ct. 1388, 1410 (2011)). On habeas review, the Court must give "substantial deference to the state court's predictive judgment," and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Williams*, 695 F.3d at 831.

The Arkansas Supreme Court reasonably concluded that defense counsel's decision not to subpoena the store owners to testify or to "subpoena information" about them "may well have been a matter of trial strategy." *See Flowers v. Norris*, 585 F.3d 413, 417-418 (8th Cir. 2009) ("strategic and tactical decisions by counsel, though they may appear unwise in hindsight, cannot serve as the basis for an ineffective-assistance claim under *Strickland*.") Finally, Petitioner's contention that the store owners' testimony or evidence of their criminal history would have exonerated him is based solely on unsupported speculation.

Under these circumstances, the Court concludes that the Arkansas Supreme Court's resolution of Petitioner's ineffective assistance of counsel claim was neither "contrary to" nor an "unreasonable application of clearly established federal law," nor was it an "unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d) and (e).

Second, Petitioner argues that his trial lawyer was ineffective for not properly challenging the sufficiency of the evidence.[5] Respondent counters that this claim is procedurally defaulted because Petitioner did not raise it in his Rule 37 appeal to the Arkansas Supreme Court.

A petitioner must "fairly present" the substance of his federal habeas claims in state court, including "one complete round of the State's established appellate review process." *See Murphy v. King*, 652 F.3d 845, 848–49 (8th Cir. 2011); *Grass v. Reitz*, 643 F.3d 579, 584-85 (8th Cir. 2011).  When a petitioner fails to comply with the fair-presentment requirement, his claims are procedurally defaulted. *Id.*

In his Reply Brief (*docket entry #11*), Petitioner makes no argument to excuse his procedural default under either the "cause and prejudice" or "actual innocence" exceptions.[6] *See Storey v. Roper*, 603 F.3d 507, 523-524 (8th Cir. 2010) ("To overcome the procedural default, [petitioner] must show cause for not presenting the claim on post-conviction appeal, and prejudice from the failure, or a fundamental miscarriage of justice-meaning that he is actually innocent.") Thus, Petitioner has procedurally defaulted his ineffective-assistance claim.

---

[5] "[Petitioner] contends that his counsel and the prosecuting attorney failed to show why he was at the site of their business in the first place. [Petitioner] states that he was either let into this place of business by the owners or [they] played a major part of the illegal activities conducted and not [Petitioner]. Either instance, appropriate charges must be defined where a crime was committed. Intent must be established where [Petitioner] was there to buy, sell, steal, disfigure, manufacture or commit a crime defined by Arkansas Statute. Had counsel defended [Petitioner] to the best of ability then these should have been his original arguments on behalf of his client for indictment." (*Docket entry #2 at 5*).

[6] Petitioner retained new lawyers to represent him in his Rule 37 hearing and appeal. While ineffective assistance of postconviction counsel "may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial," *see Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012), Petitioner does not argue that his Rule 37 lawyers were ineffective.

Third, Petitioner argues that his trial lawyer was ineffective because he was unable to suppress Petitioner's statement to the police. *Docket entry #2 at 5*. However, he does not explain what counsel should have done differently in arguing the suppression issue, and Petitioner did not raise this issue in his Rule 37 appeal.[7] Suffice it to say, Petitioner's argument that his trial lawyer was ineffective, based on the way he presented and argued the suppression issue, is procedurally defaulted for the same reasons stated in Section II.B.1, *supra*, at p.10.[8]

Finally, Petitioner argues that his trial lawyer was ineffective for failing to call Petitioner's mother and girlfriend to testify about why he was in the store, which would have helped to establish his innocence. *Docket entry #2 at 5-6*. According to Petitioner, his mother and girlfriend would have testified that he was "only at the store for a brief period of time on the night he was arrested, that he only went there to 'cool off' after an argument with [his girlfriend], and that he was on the telephone with one or both women throughout the evening." *Anderson*, 373 S.W.3d at 883.

At the Rule 37 hearing, Petitioner's trial counsel testified that he interviewed Petitioner's girlfriend and was aware that she would substantiate Petitioner's claim

---

[7] In fact, defense counsel moved to suppress Petitioner's statement and the trial court conducted a suppression hearing. Defense counsel also raised that issue on direct appeal.

[8] Petitioner also asserts a separate habeas claim that the trial court erred in denying his motion to suppress his statement. The merits of that claim are addressed in Section II.B.2, *infra*.

that they had an argument on the night in question. *Rule 37 Tr. at 299*. However, he stated that he chose not to call her because, on the night Petitioner was arrested, she had been stopped by the police in the immediate vicinity of the store after driving by it multiple times and "she could have been cross examined about that."[9] *Rule 37 Tr. at 299-300*. He also testified that he elected not to call Petitioner's mother as a witness because he had represented her in other criminal cases and knew she had a felony criminal record. *Rule 37 Tr. at 300*.

On appeal, the Arkansas Supreme Court rejected Petitioner's ineffective claim based on his trial counsel's decision not to call Petitioner's girlfriend and mother as witnesses:

> Even if it could be assumed that the two women would have offered testimony about the argument between [the girlfriend] and [Petitioner] and the telephone calls he made to them in the course of the evening, it does not follow that the testimony would have negated the evidence that linked him to the manufacture of methamphetamine on that evening. We cannot say that the trial court erred in concluding that the women's' testimony would not have been sufficient to raise the probability that the outcome of the trial would have been different.

*Anderson*, 373 S.W.3d at 883.

Given the risk of impeachment that both women faced, the Arkansas Supreme Court reasonably rejected Petitioner's ineffective assistance of counsel argument based on the questionable weight of the proposed mitigating evidence

---

[9] Before Petitioner emerged from the store, the police noticed a black Camaro that was continuously driving by the store. *Trial Tr. 71-73*. They eventually stopped the car, which was being driven by Petitioner's girlfriend. *Id.*

12

from Petitioner's mother and girlfriend, and the real probability that their testimony would have harmed Petitioner's chances for an acquittal. Thus, the Court concludes that the Arkansas Supreme Court's disposition of this aspect of Petitioner's ineffective assistance of counsel claim was neither "contrary to" nor an "unreasonable application of clearly established federal law," nor was it an "unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d) and (e).

## 2.    Motion to Suppress Statement

Petitioner argues that the trial court erred in denying his motion to suppress his statement to the police. His statement consisted of an audio recording of a "series of conversations" between Petitioner and the police at the crime scene.[10] *Trial Tr. at 666*. Petitioner's primary argument for habeas relief is that he was not given *Miranda* warnings when the police first initiated questioning.[11] According to Petitioner, he was in "custody" for purposes of *Miranda* at the moment the police began to ask him questions.

At the pretrial suppression hearing, Craighead County Deputy Baxter testified that he responded to the scene at 12:30 a.m. *Trial Tr. at 38*. Prior to arriving, he had obtained information that Petitioner was involved in

---

[10] The recording was played for the jury at trial. *Trial Tr. at 670-676; 682-695.*

[11] Respondent does not address the merits of Petitioner's *Miranda* argument. Instead, Respondent contends that all of the claims related to Petitioner's motion to suppress are not cognizable in a habeas action pursuant to *Stone v. Powell*, 428 U.S. 465 (1976) (holding that a Fourth Amendment claim is barred in a habeas action where "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim. *Docket entry #9 at 3-5.* Respondent is mistaken insofar as he contends that *Stone* bars Fifth Amendment *Miranda* claims in a habeas case – it does not. *See Withrow v. Williams*, 507 U.S. 680 (1993) (declining to extend *Stone* to bar the habeas review of *Miranda* claims).

methamphetamine manufacturing and distribution. *Trial Tr. at 39*. When he arrived at the scene and saw the modified air tank behind the store, he believed that a crime had been committed. *Trial Tr. at 40*. The tank was about ten feet from the parked truck that was registered to Petitioner. *Trial Tr. at 41*. The store was locked and the officers began trying to contact the owners of the store. *Trial Tr. at 47*.

About fifteen or twenty minutes after Baxter arrived, Petitioner unlocked the front door and emerged from the store. *Trial Tr. at 44*. Baxter and a fellow officer named "Lane" began questioning Petitioner. *Trial Tr. at 48, 57*. Baxter recorded the conversation with a tape recorder, but did not tell Petitioner that he was recording their conversation. *Trial Tr. at 48*.

Baxter did not know why he did not inform Petitioner of his *Miranda* rights as soon as he came out of the store. *Trial Tr. at 48-49*. Lane testified that he did not administer *Miranda* warnings when Petitioner came out of the store because he was not under arrest. *Trial Tr. at 103*. Yet, Lane went on to testify that Petitioner was "*not free to leave*" and under "*investigative detention until we could see exactly what had taken place*." *Trial Tr. at 103* (emphasis added). Lane made no attempt to explain the difference between being placed "under arrest" and "not being free to leave" or being placed "under investigative detention."

Finally, Lane testified that, while Petitioner was being detained, the officers were trying to contact the owners of the store in order to determine if it was a

burglary situation. *Trial Tr. at 103-104*. While the officers were talking to Petitioner in front of the door to the store, he was not handcuffed. *Trial Tr. at 67, 94*.

The transcript of the audio recording reflects that the deputies asked Petitioner a lengthy series of questions, including: (1) if he worked at the store; (2) whether it was his truck parked around the back, and would consent to its search; (3) whether he owned the store; (4) whether he smelled ammonia; (5) why he parked around back; (6) who owned the store; (7) how he got in the store; (8) whether he knew anything "about this blue tank back here," and "what it was;" (9) why he moved the tank; (10) whether he had been in the shed or had keys to it; and (11) whether he had been in trouble before.[12] *Court's Ex. A at 1-9*.

At some point well into their questioning of Petitioner, a deputy says to him "[you are] not under arrest or anything," but, then immediately proceeds to give Petitioner his *Miranda* rights.[13] *Id. at 10-11*. As the questioning continues, a deputy advises Petitioner of his *Miranda* rights for a second time. *Id. at 23-24*. At the end of questioning, Petitioner is formally placed under arrest.

Petitioner testified that he walked out of the store and encountered Lane and Baxter outside of the front door. *Trial Tr. at 137*. According to Petitioner, the

---

[12] The 42-page transcript of the audio recording was part of the supplemental addendum in Petitioner's direct appeal. *See 2006 WL 5019417*. However, the parties did not make it part of the record in this case. A copy of the transcript of the audio recording, marked Court's Exhibit A, is attached to this Recommended Disposition.

[13] The record developed at the suppression hearing is unclear as to the length of time that the officers questioned Petitioner.

deputies were polite, did *not* reach for their weapons, attempt to handcuff him, or

otherwise attempt to restrain him in any way:

> Q: And I think we're agreed at that point [up until Petitioner was first advised of his *Miranda* rights] you're not under arrest, you've not been handcuffed, no one's pulled a gun, and those questions have been freely and voluntarily answered by you. Am I correct?
>
> A. Yes.

*Trial Tr. at 137, 143.*

The trial court ruled that the initial questioning of Petitioner, prior to first

being read his *Miranda* rights, took place in the context of a *Terry* stop authorized

by Rule 3.1 of the Arkansas Rule of Criminal Procedure.[14] Pursuant to that Rule,

the trial court held that the officers were allowed to question Petitioner without

advising him of his *Miranda* rights:

> The Court finds that when [Petitioner] first came out of the store and before he was advised on his constitutional rights, under *Miranda*, he was detained and was not necessarily free to leave. And this was in the nature of a Rule 3.1 stop where a law enforcement officer, that being Officers Baxter and Lane, were lawfully present where they were and they had the right under Rule 3.1 to stop and detain [Petitioner], who, I find, they had reasonable suspicion was involved in the commission of a felony. They [sic], a detention under Rule 3.1, is not necessarily the same as custody in terms of a custodial interrogation and doesn't necessarily invoke the *Miranda* rights. This is most commonly seen in traffic stops where the person is obviously detained, but the officer is permitted to ask questions. I find that the questioning of [Petitioner] prior to the advice of rights was

---

[14] Rule 3.1 of the Arkansas Rules of Criminal Procedure authorizes an officer to "stop and detain any person who he reasonably suspects" has committed a felony, "either to obtain or verify the identification of the person or to determine the lawfulness of his conduct." Rule 3.1 is a codification of the rule established in *Terry v. Ohio*, 392 U.S. 1 (1968) (authorizing an investigatory stop based on reasonable suspicion of criminal activity).

appropriate, the length of the detention was not unreasonable at this time, prior to his being placed in custody and that the statements that he made at that time are not to be suppressed because of their nature and the, the [Petitioner] was not in custody in terms of the Fourth Amendment. I find that once he was advised of his rights by Detective Lane that the situation had changed at that point and he was in custody from that point on.

*Trial Tr. at 160-161.*

On direct appeal, the Arkansas Court of Appeals held that the deputies' initial questioning of Petitioner was not a custodial interrogation requiring *Miranda* warnings:

> *Miranda* warnings are required only in the context of custodial interrogation. *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997). A person is "in custody" for purposes of the *Miranda* case when he or she is deprived of his freedom of action by formal arrest or restraint on freedom of movement of the degree associated with a formal arrest; in resolving the question of whether a suspect was in custody at a particular time, the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation. *Id.* The determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being interrogated. *Id.* Here, appellant's statements were properly admitted. His initial conversation with police officers was non-confrontational, and appellant himself admitted that, when he made them, he was not under arrest or coerced and freely answered the questions. Subsequent questions posed after the store was searched were preceded by *Miranda* warnings.

*Anderson*, 2007 WL 2782556 at *3.

Notably, the Arkansas Court of Appeals neither adopted nor even addressed the trial court's *Terry* stop analysis to justify the officers' questioning of Petitioner, before advising him of his *Miranda* rights. Of course, what makes this issue such a

close question is that Officer Lane unequivocally admitted in his testimony that Petitioner was "detained" and "not free to leave" as soon as he exited the store. Yet, in reaching their decisions that no *Miranda* warning was necessary before or shortly after Baxter and Lane began their questioning of Petitioner, both the trial court and the Court of Appeals fail to mention anything about Lane's troubling admission that he essentially deemed Petitioner to be in some nebulous form of custody when the questioning began.

When Petitioner emerged from the store, the circumstances at the scene certainly gave the officers reasonable suspicion that "someone" was involved in drug-related criminal activity. Baxter arrived at the store approximately 12:30 a.m. *Trial Tr. at 38*. After discovering evidence that drug paraphernalia used to manufacture methamphetamine was in close proximity to the store, Baxter and Lane began shining their flashlights inside the store and knocking on the door to see if anyone was inside. *Trial Tr. at 61-62, 77, 631-632*. According to Baxter, it took Petitioner fifteen to twenty minutes to respond to their knocks and emerge from the store. *Trial Tr. at 44*.

Petitioner's after-hours presence inside a store, with all the lights turned off, and his delay in responding to the attempts by the officers to discover if anyone was inside, created a reasonable suspicion that Petitioner might be connected to the methamphetamine-manufacturing paraphernalia located outside the store. Thus,

pursuant to *Terry*, the officers were authorized to stop him and "ask . . . a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *United States v. Garcia*, 646 F.3d 1061, 1068 (8th Cir. 2011). "[M]ost *Terry* stops do not trigger the detainee's *Miranda* rights even though one is not free to leave a *Terry* stop until the completion of a reasonably brief investigation."[15] *United States v. Castillo-Martinez*, 451 Fed. Appx. 615, 619 (8th Cir. 2012) (internal quotations and alterations omitted). However, "[a]n investigatory detention may turn into an arrest if it lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Martinez*, 462 F.3d 903,

In *Berkemer v. McCarty*, 468 U.S. 420, 436-437 (1984), the United States Supreme Court recognized that a suspected drunk driver detained in a traffic stop pursuant to *Terry* was not free to leave, and thus "seiz[ed] within the meaning of [the Fourth] Amendment." Nonetheless, the Court held that the driver was not in "custody" for purposes of *Miranda* when the arresting officer performed a traffic stop, questioned him, administered a field sobriety test, and asked the driver questions that elicited admissions that he had been drinking and using drugs. Because the defendant "failed to demonstrate . . . he was subjected to restraints

---

[15] In *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004), the Eleventh Circuit noted that a suspect detained in a *Terry* stop is not free to leave, and therefore that a "literal" application of the *Miranda* custody standard to a *Terry* stop would require *Miranda* warnings "before any questioning could occur during any *Terry* stop."

comparable to those associated with formal arrest," he was not entitled to *Miranda* warnings. *Id.* at 441.

Relying on *Berkemer*, the Eighth Circuit has rejected a categorical rule that *Miranda* warnings are never required in a *Terry* stop, and stated that the "ultimate [*Miranda* custody] inquiry is whether: (1) the person has been formally arrested; or (2) the person's freedom of movement has been restrained to a degree associated with formal arrest."[16] *United States v. Martinez*, 462 F.3d 903, 908-909 (8th Cir. 2006).

It is undisputed that Petitioner voluntarily came out of the store and, once outside, he talked to the officers and answered their questions. He was not handcuffed, or physically restrained.  The police officers were polite and it does not appear that Petitioner was "strong armed" by the officers. While it is no way dispositive, Petitioner himself testified that, during the time he was being questioned by Deputies Baxter and Lane, he did *not* believe he was under arrest and he freely and voluntarily answered their questions. These factors are consistent

---

[16] "To determine whether a defendant was in custody, for *Miranda* purposes, a court looks to the totality of the circumstances confronting the defendant at the time of the interview, and asks whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest. The inquiry is an objective one, without consideration of the participants' subjective views. The following non-exclusive factors inform the custody inquiry: (1) whether the suspect was informed that he was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong arm tactics or strategies were employed; (5) whether the atmosphere was police dominated; or, (6) whether the suspect was placed under arrest at the end of questioning. The first three ... factors which, if present, mitigate against the existence of custody ... the last three ... are aggravating factors which, if present, aggravate the existence of custody." *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) (internal quotations and citations omitted).

with permissible *Terry*-stop questioning that does not require officers to advise a detainee of his *Miranda* rights.

Other factors, however, support Petitioner's position that he was in custody when he exited the store. The officers did not tell Petitioner he was free to leave when they initiated questioning. Furthermore, in the suppression hearing, Deputy Lane testified that, during his initial questioning of Petitioner, he was "*not* free to leave" and "under investigative detention," language that strongly suggests Petitioner was "deprived of his freedom of movement" to a degree normally associated with being placed "under arrest." Finally, Petitioner's questioning appears to have been "police dominated," with as many as four police officers at the scene.

While the Arkansas Court of Appeals may well have reached an erroneous conclusion that Petitioner was not "in custody" during his questioning by Deputies Baxter and Lane, such an error, in and of itself, does not warrant habeas relief. The state court decision must be more than erroneous, it must also be "unreasonable." *See* 28 U.S.C. § 2254(d); *see also Eastin v. Hobbs*, 688 F.3d 911, 915 (8th Cir. 2012) ("A state court decision may be incorrect, yet still not unreasonable, and we will grant [habeas] relief only if the state court decision is both incorrect and unreasonable.").

In the context of habeas review of state court decisions, the United States Supreme Court has emphasized that the *Miranda* custody standard is a "general rule" subject to "differing indications" about "how a reasonable person in the suspect's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662-666 (2004). The more general the rule, "the more leeway courts have in reaching outcomes in case-by-case judgments." *See id.* at 665. Thus, as long as the state court's application of the *Miranda* custody standard "fits within the matrix of [the Supreme Court's] prior decisions," habeas relief under the deferential AEDPA standard is not warranted. *See id. at 665.*

Given the countervailing "indicators of custody" in play in this case, the Court cannot say that the decision of the Arkansas Court of Appeals was both incorrect *and* unreasonable, or that it does not "fit within the matrix" of clearly established federal law. *See United States v. Perrin*, 659 F.3d 718 (8th Cir. 2011) (defendant was not "in custody" when he was interviewed in his bedroom by one of six federal officers in tactical gear that had executed a search warrant for child pornography – "We have held that circumstances more dominated by police were not custodial.") (*citing United States v. Czichray*, 378 F.3d 822, 825, 830 (8th Cir. 2004) (defendant was not in custody for *Miranda* purposes despite an "ensuing interview[] which lasted nearly seven hours") and *United States v. LeBrun*, 363 F.3d 715, 721 (8th Cir. 2004) (defendant was not in custody for *Miranda* purposes

when he gave inculpatory statements in a windowless room with enlarged photographs on the wall as a deceptive interview tactic and the officers "falsely trumped up the evidence they said they possessed.")).

Accordingly, the Court concludes that the Arkansas Court of Appeals' disposition of Petitioner's *Miranda* claim was neither "contrary to" nor an "unreasonable application of clearly established federal law," nor was it an "unreasonable determination of the facts."[17] *See* 28 U.S.C. § 2254(d) and (e).

### 3.    Motion to Suppress Evidence Seized From the Crime Scene

Petitioner raises a number of Fourth Amendment claims arguing that the police officers conducted an unlawful search and seizure at the crime scene. *Docket entry #2 at 11-20.*

Petitioner's Fourth Amendment claims are barred from habeas review by the Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465 (1976).[18] The trial court conducted a suppression hearing and there is no question that the state provided a "corrective mechanism" on direct appeal. Thus, Petitioner received a "full and fair opportunity" to litigate his Fourth Amendment claims, and they are

---

[17] Petitioner also argues that, *after* he was first administered *Miranda* warnings, he requested counsel and the police failed to honor that request. This argument was not raised on direct appeal. Therefore, it is procedurally defaulted under the same analysis set forth in Section II.B.1, *supra*, at p.10.

[18] In *Stone*, the Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone*, 428 U.S. at 482. In order to show that he did not receive the opportunity for full and fair litigation of his Fourth Amendment claim, a habeas petitioner must show that the state "provided no corrective procedures at all to address the alleged Fourth Amendment violation," or that the State "provided a corrective mechanism, but [he] was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Chavez v. Weber*, 497 F.3d 796, 802 (8th Cir. 2013).

now barred from habeas review pursuant to *Stone*. *See Chavez*, 497 F.3d at 801-803.

**4.     Double Jeopardy Claim**

Finally, Petitioner argues that his multiple convictions unconstitutionally punished him for the same criminal conduct in violation of the Double Jeopardy Clause.[19] *Docket entry #2 at 22*. Respondent contends that this claim is procedurally defaulted due to Petitioner's failure to raise it in state court. *Docket entry #9 at n.2*.

For the reasons stated in Section II.B.1, *supra*, at p.10, the Court concludes that Petitioner's double jeopardy argument is procedurally defaulted.

### III. Conclusion

IT IS THEREFORE RECOMMENDED THAT the Petition for a Writ of Habeas Corpus be DENIED, and this case be DISMISSED, WITH PREJUDICE. IT IS FURTHER RECOMMENDED THAT a Certificate of Appealability be DENIED pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases.

Dated this 27th day of November, 2013.

_____
UNITED STATES MAGISTRATE JUDGE

---

[19] In his habeas Petition, he makes only a conclusory double jeopardy argument. However, in his Reply Brief, he attempts to elaborate on the specifics of that claim. *See docket entry #11*.

24

SUPPLEMENTAL ADDENDUM

TRANSCRIPT OF AUDIO RECORDING

OFFICER:   YOU WORK HERE?

ANDERSON: I'M DOING THE CLEAN UP IN HERE.

OFFICER:   DO WHAT, NOW?

ANDERSON: I DO THE CLEAN UP IN HERE.

OFFICER:   OH, ARE YOU, OKAY, ALRIGHT, IS THAT YOUR TRUCK AROUND
           BACK

ANDERSON: YEAH, YEAH, THAT'S MY TRUCK

OFFICER:   IS IT? OH, OKAY. WE'VE BEEN OUT HERE FOR A LITTLE BIT.

ANDERSON: I'VE BEEN IN THERE SLEEPING.

OFFICER:   OH REALLY.

ANDERSON: YEAH, WHAT'S GOING ON.

OFFICER:   DO YOU OWN THIS PLACE, OR

ANDERSON: NO, MY FRIEND DOES

OFFICER:   WHO OWNS IT?

ANDERSON: UM, JUNIOR DOWN THE ROAD AND HIS, UH, GRANDSON

OFFICER:   WHO'S THAT?

ANDERSON: JUNIOR

OFFICER:   JUNIOR?

ANDERSON: UM, I FORGOT HIS LAST NAME, I THINK IT'S TIPTON TO TELL YOU
           THE TRUTH

1.



OFFICER:     TIPTON, ALRIGHT, WHAT'S YOUR NAME?

ANDERSON: SEDRIC

OFFICER:     SEDRIC WHAT?

ANDERSON: ANDERSON

OFFICER:     OKAY, ALRIGHT.

ANDERSON: I SEEN THE LIGHT IN THERE. IT WOKE ME UP

OFFICER:     OH REALLY.

ANDERSON: BUT I THOUGHT I HEARD SOMEBODY OUT HERE A FEW MINUTES
                    AGO. WAS Y'ALL OUT HERE?

OFFICER:     YEA. WE'VE BEEN HOLLERING AND STUFF. WE THOUGHT
                    SOMEBODY MIGHT BE INSIDE.

ANDERSON: UH-HUH, I'M THE ONLY ONE HERE. I JUST WOKE UP WHEN Y'ALL,
                    WHEN I SAW ALL THE LIGHTS AND STUFF.

OFFICER:     OH REALLY, OKAY. ALRIGHT

ANDERSON: WHAT'S GOING ON?

OFFICER:     JUST OUT HERE CHECKING ON SOME STUFF. DO YOU NOT SMELL
                    AMMONIA BACK THERE?

ANDERSON: NO, I SMELLED SOME SHIT WHEN I GOT HERE, YOU KNOW WHAT I'M
                    SAYING, BUT YEA, WHEN I PARKED BACK THERE. I DIDN'T KNOW
                    WHAT IT WAS. (INAUDIBLE)

OFFICER:     WHY DID YOU PARK AROUND BACK LIKE THAT FOR?

ANDERSON: ME AND MY GIRLFRIEND BEEN INTO IT AND HE LET ME, YOU KNOW,
                    COME OUT HERE AND STAY, SO.

OFFICER:     OH REALLY, YOU DIDN'T WANT HER TO KNOW THAT YOU WAS
                    HERE OR SOMETHING?

2.

ANDERSON: NO, I REALLY DIDN'T WANT TO TALK TO HER, YOU KNOW WHAT I'M SAYING, CAUSE SHE'S GOING TO CUSS ME OUT EVERY TIME I CALL HER SO YOU KNOW LIKE FORGET IT.

OFFICER:   WHAT THE, WHICH DOOR DID YOU COME IN?

ANDERSON: THIS ONE.

OFFICER:   OH REALLY

ANDERSON: IT'S THE ONLY ONE I GOT A KEY TO.

OFFICER:   WHAT'S THE GUY'S NAME THAT OWNS THIS?

ANDERSON: UH, WILLIAM TIPTON AND UH, I FORGOT HIS GRANDPA'S NAME BUT HIS GRANDPA, HE STAY DOWN THERE ON COUNTY ROAD DOWN THERE.

OFFICER:   WILLIAM TIPTON?

ANDERSON: YEAH

OFFICER:   HE THE ONE THAT OWNS IT?

ANDERSON: YEA AND HIS GRANDFATHER. I FORGOT HIS GRANDFATHER'S LAST NAME, JUNIOR, UM

OFFICER:   WILLIAM TIPTON, T-I-P-T-O-N?

(INAUDIBLE)

OFFICER:   OKAY THAT'S A DIFFERENT ONE, TRY WILLIAM TIPTON, WILLIAM TIPTON. HE MAY BE THE OWNER.

OFFICER:   YOU KNOW ANYTHING ABOUT THIS BLUE TANK BACK HERE?

ANDERSON: NO, I DON'T KNOW NOTHING ABOUT NOTHING BACK THERE I KNOW WHEN I PULLED UP THERE WAS SOME STUFF BACK THERE BUT LIKE I SAID...(INAUDIBLE)

OFFICER:   WHAT ALL WAS BACK HERE?

3.

ANDERSON:  OH, I SEEN THE TANK BACK THERE. I SCOOTED IT OUT THE WAY.
(INAUDIBLE)

OFFICER:     YOU KNEW WHAT IT WAS DIDN'T YOU?

ANDERSON: I'M NOT GONNA BE 100% SURE BUT YOU KNOW IT AIN'T NONE OF
MINE SO YOU KNOW WHAT I'M SAYING.  I JUST PARKED MY
VEHICLE BACK THERE AND I CAME IN.

OFFICER:     WHY DID YOU MOVE IT OUT OF THE WAY FOR?

ANDERSON: CAUSE THAT'S WHERE I PARK IT ALL THE TIME, RIGHT THERE.

OFFICER:     WHERE WAS IT AT WHEN YOU MOVED IT?

ANDERSON: AH, IT WAS RIGHT OUT THERE IN THE MIDDLE OF THE ROAD. RIGHT
UP THERE BY WHERE Y'ALL ARE PARKED AT.

OFFICER:     OH, IT WAS RIGHT THERE?

ANDERSON:  YEAH.

OFFICER:     THEN YOU MOVED IT UP THERE?

ANDERSON: I JUST MOVED IT RIGHT AROUND THERE.

OFFICER:     WAS IT HEAVY?

ANDERSON: AH, IT (INAUDIBLE) A LITTLE HEAVY BUT IT ..(INAUDIBLE)

OFFICER:     YOU BEEN BACK THERE IN THAT SHED?

ANDERSON: NO, I DON'T HAVE NO KEYS TO NOTHING BACK THERE.

OFFICER:     YOU DON'T HAVE ANY KEYS OR NOTHING?

ANDERSON: NA (INAUDIBLE)

OFFICER:     YOU DIDN'T BRING ANYBODY WITH YOU?

ANDERSON: NO, I'M BY MYSELF.

OFFICER:    HMM, YOU DON'T HAVE ANY KEY TO THAT BACK SHED BACK
THERE?

ANDERSON: NO, I GOT MY KEYS IN MY TRUCK, MAN

OFFICER:    OH REALLY?

ANDERSON: I DON'T GOT NOTHING ELSE.

OFFICER:    DO YOU MIND IF I LOOK AT THIS?

ANDERSON: GO AHEAD. THAT'S TO MY TRUCK

OFFICER:    HMMM, THAT IS YOUR TRUCK BACK THERE?

ANDERSON: YEA, THAT'S MY TRUCK THERE

OFFICER:    OK. SO WHERE WAS THAT TANK SETTING AT AGAIN?

ANDERSON: RIGHT OUT HERE.

OFFICER:    IN THE MIDDLE OF THE DRIVE HERE?

ANDERSON: RIGHT WHEN YOU TAKE YOUR TURN RIGHT THERE, IT WAS RIGHT
THERE.

OFFICER:    DIDN'T IT LOOK DANGEROUS TO YA?

ANDERSON: YEA, IT DID, THAT'S WHY I DIDN'T REALLY TOUCH IT, YOU KNOW, I
JUST MOVED IT OUT THE WAY

OFFICER:    WELL, YOU CARRIED IT A PRETTY GOOD WAYS, IF YOU PUT IT
WHERE ITS AT RIGHT NOW.

ANDERSON: (INAUDIBLE) ITS RIGHT THERE, BEEN RIGHT THERE. IT'S BEEN
RIGHT THERE CAUSE I BEEN TRYING TO CALL HIM AND FIND WHAT
THE HELL IS GOING ON. (INAUDIBLE) AND I DIDN'T GET NO ANSWER
SO I DON'T KNOW (INAUDIBLE) SO DID HE KNOW ANYTHING ABOUT
THAT

OFFICER:    WHY DIDN'T YOU CALL US

ANDERSON: HONESTLY, I DON'T EVEN KNOW TO TELL YOU THE TRUTH. I DON'T NEED LIE TO YA. I DON'T EVEN KNOW. IT WAS HIS PLACE. I FIGURE HE MUST KNOW SOMETHING ABOUT IT, YOU KNOW.

OFFICER: YOU SURE IT AIN'T YOURS? ALL I'M LOOKING FOR IS THE TRUTH HERE. YA SURE?

ANDERSON: NO, I'M TELLING, I'M TELLING YOU STRAIGHT UP.

(INAUDIBLE)

OFFICER: DOES HE LIVE IN GREENE COUNTY?

ANDERSON: BE BONO, GREENE COUNTY, SOMETHING LIKE TOWARDS BONO, IS THAT CRAIGHEAD, GREENE, WHATEVER.

OFFICER 1: 10-4

OFFICER1: IS HE OUT HERE WITH YOU SEDRIC?

ANDERSON: NO, I'M BY MYSELF.

OFFICER 1: YOU GOT A CELL PHONE?

ANDERSON: YEA.

OFFICER 1: WHY DON'T YOU CALL HIM?

ANDERSON: MY BATTERY'S DEAD BUT LET ME CHARGE IT UP IN MY TRUCK AND I'LL CALL HIM.

OFFICER 1: WHAT'S THEIR PHONE NUMBER?

ANDERSON: 935-

OFFICER 1: DISPATCH COPY 88 - 935

ANDERSON: 1787

OFFICER 1: 1787. 935-1787. SEE IF HE CAN COME DOWN HERE.

OFFICER 1: SO, DO YOU LIVE HERE OR ARE YOU JUST STAYING HERE TONIGHT?

6.

ANDERSON: NO, I DON'T LIVE HERE.  I'M JUST HERE TONIGHT.

OFFICER 1:   TONIGHT THE ONLY NIGHT YOU'RE STAYING HERE?

ANDERSON: YEA, IT'S THE ONLY NIGHT I EVER STAYED HERE TOO.

OFFICER 1:   SO YOU WASN'T PLANNING ON STAYING TOMORROW NIGHT OR NOTHING LIKE THAT?

ANDERSON: NO

OFFICER 1:   OKAY.

ANDERSON: I FIGURE I GO TO MY AUNT (INAUDIBLE) HOUSE OR SOMETHING (INAUDIBLE)

OFFICER 1:   OKAY

OFFICER 2:   WHERE ARE YOU SLEEPING AT IN THERE?

ANDERSON: I WAS BACK THERE IN THE OFFICE BACK THERE IN A CHAIR

OFFICER 2:   IS THAT YOUR JACKET RIGHT THERE ON THAT CHAIR?

ANDERSON: NO, UH-HUH, AIN'T NOTHING MINE, THIS IS MINE, HERE.

OFFICER 1:   DO YOU HAVE ANY BELONGINGS OR ANYTHING IN THERE?

ANDERSON: THIS IS ME, RIGHT HERE, THIS IS ME WHAT I GOT ON, (INAUDIBLE)

OFFICER 2:   (INAUDIBLE)

ANDERSON: HUH?

OFFICER 2:   YOU DON'T HAVE NOTHING ELSE INSIDE?

ANDERSON: I DON'T HAVE NOTHING, ALL I GOT IS WHAT'S ON ME, THIS IS MY KEYS AND MY MONEY, THAT'S IT.

OFFICER 1:   NO BAG OR NOTHING LUGGAGE?

ANDERSON: NO, I DON'T GOT NOTHING, NO CLOTHES OR NOTHING

7.

OFFICER 1:  OKAY

OFFICER 2:  WE SURE ARE CONCERNED FOR YOU BEING UP HERE THIS LATE AT
NIGHT, THIS BUSINESS IS CLOSED...

ANDERSON: YEA I KNOW, I UNDERSTAND, I SEE WHAT YOU'RE SAYING...ME AND
HIM TALKED ABOUT THAT TOO, YOU KNOW WHAT I'M SAYING, I
SAID, I TOLD HIM I SAID I AIN'T FIXIN TO HAVE NOBODY UP HERE,
YOU KNOW. I'M NOT GONNA DO YOU LIKE THAT, I WAS JUST
COMING UP HERE TO SPEND THE NIGHT YOU KNOW (INAUDIBLE)
WAIT FOR HER SINCE WE CAN'T GET ALONG YOU KNOW.

OFFICER 2:  THIS BUSINESS HAS BEEN BROKEN INTO SEVERAL TIMES, YOU CAN
TELL BY THE BARS ON THE WINDOWS (INAUDIBLE)

ANDERSON: HE TOLD ME WHEN HE FIRST BOUGHT THE PLACE THAT THE DUDE
TOLD HIM THAT HE HAD SOME BREAKINS AND SOME STUFF LIKE
THAT TOO SO. (INAUDIBLE)

OFFICER 1:  TELL HIM THERE'S AN ANHYDROUS TANK ON HIS PROPERTY AND
WE WANT TO TALK TO HIM ABOUT IT.

ANDERSON: NO, LIKE I SAID, WHEN HE FIRST BOUGHT THE PLACE, DUDE WAS
TELLING HIM ABOUT IT AND HE WAS TELLING ME ABOUT IT, YOU
KNOW. BUT YOU KNOW, I AIN'T GOT NOTHING TO DO WITH THAT
YOU KNOW I KNOW WHAT HE TOLD ME YOU KNOW.

OFFICER 1:  HE TOLD YOU WHAT?

ANDERSON: ABOUT THE PLACE BEING BROKE INTO

OFFICER 1:  OH YEAH.

ANDERSON: THAT'S WHAT DUDE TOLD HIM THAT OWNED IT BEFORE

OFFICER 1:  SO YOU CALLED HIM WHENEVER YOU SAW THE TANK, IS THAT
RIGHT?

ANDERSON:  I BEEN TRYING TO CALL HIM EVER SINCE PROBABLY ABOUT,
BEFORE I WENT TO SLEEP, I WENT TO SLEEP PROBABLY ABOUT
NINE, I MADE IT OUT HERE PROBABLY ABOUT EIGHT AND I DID A
LITTLE CLEAN UP IN THERE, YOU KNOW WHAT I'M SAYING, SWEPT

THE FLOOR AND STUFF. UM, WHEN I, I LEFT ONCE AND WENT AND GOT ME SOMETHING TO EAT AND CAME BACK AND I TRIED CALL TO CALL HIM, I STILL COULDN'T CALL HIM. EVER TIME I TRY TO CALL OUT HERE, ITS BEEN GIVING ME NO SERVICE AND EVER TIME IT CONNECT IT'LL JUST DISCONNECT SO I DON'T KNOW AND MY BATTERY WASN'T UP THAT HIGH, ANYWAY SO I WAS LIKE, FORGET THIS, I'M WANNA LAY DOWN.

OFFICER 2:   WHERE DO YOU LIVE AT, SEDRIC?

ANDERSON:  I LIVE IN TRUMANN.

OFFICER 1:   GO AHEAD

ANDERSON: I BEEN STAYING WITH MY GIRL, BUT YOU KNOW,

OFFICER 1:   10-4.

ANDERSON: THAT'S WHERE SHE STAYS

OFFICER 2:   WHAT'S YOUR GIRLFRIEND'S NAME?

ANDERSON: RENEE

(INAUDIBLE)

OFFICER 2:   DOES YOUR GIRLFRIEND KNOW YOU ARE OUT HERE OR WHERE YOU'RE AT

ANDERSON: UNLESS SHE CAME OUT HERE AND SEEN MY TRUCK OR SOMETHING, THAT'S THE ONLY THING BUT AS OF ME TALKING TO HER AND SENDING HER OUT HERE, NO.

OFFICER 1:   WILL, UH, WILL YOU COME OVER HERE AND TALK TO US?

ANDERSON: YEA, NO PROBLEM, MAN

OFFICER 1:   OKAY

OFFICER 2:   (INAUDIBLE) BEEN IN ANY TROUBLE BEFORE, PARTNER?

ANDERSON: NO, I GOT IN TROUBLE A LONG TIME AGO MAN ABOUT SOME XANAX'S I WAS IN SCHOOL, TAKING XANAX'S

9.

OFFICER 2:   YOU AIN'T ON NO PROBATION OR NO PAROLE

ANDERSON:  NO PROBATION, NO PAROLE

OFFICER 1:   JUST MISDEMEANORS, NO FELONIES, NOTHING LIKE THAT, RIGHT

ANDERSON: (INAUDIBLE), JUST MISDEMEANORS, NO BULLSHIT, NO

OFFICER 1:   OKAY. THAT'S COOL.

ANDERSON: JUST TRYING TO DO WHAT' RIGHT, YOU KNOW WHAT I'M SAYING.

OFFICER 1:   THAT'S COOL.

ANDERSON: EVER SINCE I GOT IN TROUBLE WHEN I WAS IN SCHOOL, I AIN'T
              BEEN IN NO TROUBLE, MAN

OFFICER 1:   HOW OLD ARE YA?

ANDERSON:  24

OFFICER 1:   OH, OKAY. HMM.

OFFICER 2:   WE'RE GONNA ASK YOU A FEW QUESTIONS, OKAY?

ANDERSON: UH-HMM

OFFICER 1:   WELL, YOU'RE NOT UNDER ARREST OR ANYTHING.  YOU
              UNDERSTAND THAT DON'T YOU.

ANDERSON: WELL, I HOPE SO CAUSE I DON'T GOT NOTHING TO DO WITH
              ANYTHING OUT HERE, YOU KNOW WHAT I'M SAYING.

OFFICER 1:   YEA.

OFFICER 2:   BEFORE WE ASK YOU ANY QUESTIONS, I KNOW YOU'RE PROBABLY
              FAMILIAR WITH WHAT YOUR RIGHTS ARE, ....

ANDERSON: WITH WHAT?

OFFICER 2:   YOU KNOW WHAT YOUR RIGHTS ARE...

ANDERSON: OKAY

OFFICER 2:   YOU'RE NOT UNDER ARREST YOU KNOW THE PROTOCOL. YOU KNOW WHAT YOUR RIGHTS ARE.

ANDERSON: OKAY, OKAY

OFFICER 2:   I'M GONNA GO AHEAD AND MAKE SURE THAT YOU UNDERSTAND EM AGAIN.

OFFICER 1:   WE JUST LIKE TO READ EM TO YA JUST SO YOU KNOW.

ANDERSON: OKAY, OKAY

OFFICER 2:   YOU HAVE THE RIGHT TO REMAIN SILENT

ANDERSON: OKAY

OFFICER 2:   ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN A COURT, COURT OF LAW (INAUDIBLE)

ANDERSON: OKAY

OFFICER 2:   YOU HAVE THE RIGHT TO AN ATTORNEY. IF YOU CANNOT AFFORD AN ATTORNEY, ONE WILL BE APPOINTED TO YOU BY THE COURTS FREE OF CHARGE HOWEVER YOU MAY EXERCISE YOUR RIGHT TO NOT SPEAK WITH AN ATTORNEY YOU MAY ANSWER QUESTIONS AND MAKE STATEMENTS AS YOU SO DESIRE, (INAUDIBLE) REFUSE TO ANSWER QUESTIONS OR MAKE A STATEMENT AND MAY STOP THE QUESTIONS AT ANY TIME YOU HAVE A RIGHT TO CONSULT WITH AN ATTORNEY

ANDERSON: OKAY.

OFFICER 2:   DO YOU UNDERSTAND THAT?

ANDERSON: YES.

OFFICER 2:   OKAY, WITH THOSE RIGHTS IN MIND, WE WANT TO ASK YOU A FEW QUESTIONS, IS THAT OKAY?  IS THAT OKAY?

ANDERSON: YEA.

OFFICER 2:   FIRST OF ALL, MY NAME IS CHRIS LANE AND I AM WITH THE DRUG TASK FORCE.

11.

ANDERSON: YEAH

OFFICER 2:   THE REASON I'M HERE IS WHEN PEOPLE DISCOVER, THESE DEPUTIES OR SO, DISCOVER STUFF LIKE THAT..

ANDERSON: OKAY, OKAY.

OFFICER 2:   THEY CALL ME AND THAT'S THE REASON I'M HERE. I'M GONNA BE STRAIGHT UP WITH YA, OKAY.

ANDERSON: OKAY

OFFICER 2:   WE KNOW A LITTLE BIT MORE ABOUT WHAT'S GOING HERE THAN WHAT WE ACT LIKE WE KNOW

ANDERSON: OKAY (INAUDIBLE) KNOW WHAT I'M SAYING

OFFICER 2:   GOT IT? THE REASON WHY I PULLED YOU TO THE SIDE

ANDERSON: OKAY

OFFICER 2:   I'M NOT SAYING, I'M NOT SAYING EVERYTHING HERE OR EVERYTHING THAT'S GOING ON HERE IS ALL SEDRIC'S, OKAY

ANDERSON: I SEE WHAT YOU'RE SAYING

OFFICER 2:   BUT I WANNA SEE, I'M GONNA GIVE YOU FIRST SHOT TO BE STRAIGHT ABOUT EVERYTHING

ANDERSON: UH-HMM

OFFICER 2:   THAT A WAY WE CAN KINDA SEE WHAT YOUR INVOLVEMENT IS, OKAY, I MEAN WE JUST DIDN'T POP UP HERE,

ANDERSON: I UNDERSTAND

OFFICER 2:   OKAY, WE KINDA KNOW WHAT'S GOING ON. I'M GONNA GIVE YOU FIRST SHOT TO SEE WHAT YOU GOT TO SAY BEFORE WE START MAKING ANY KIND OF AH, DECISIONS ABOUT WHAT TO DO...

ANDERSON: UH-HUH

12.

OFFICER 2:   AND KINDA, THAT A WAY WE CAN HEAR WHAT YOUR SIDE OF THE STORY IS , OKAY.

ANDERSON: RIGHT, RIGHT, RIGHT. I UNDERSTAND.

OFFICER 2:   I MEAN, IT'S LIKE, I MEAN, THERE'S DEFINITELY SOME STUFF I THINK THAT'S THAT COULD BE DISCOVERED HERE OKAY, AND UH, MY FIRST QUESTION RIGHT OFF THE BAT IS — IS YOUR PRINTS GONNA BE ON ANY OF THESE ITEMS AND IF SO, WHY?

ANDERSON: ONLY THING I CAN TELL YOU IS WHEN I MOVED THAT TANK AND UH, I MOVED SOME STUFF IN THERE.

OFFICER 2:   WHAT DID YOU MOVE INSIDE THERE?

ANDERSON: SOME BAGS OF STUFF YOU KNOW SHIT IN THERE, JUST

OFFICER 1:   DID THEY HAVE LIQUID IN THEM?

ANDERSON: OIL,

OFFICER 1:   WHAT KIND OF OIL?

ANDERSON: NAW, SOME KIND OF OIL.

OFFICER 2:   EXPLAIN TO ME WHAT IT IS, WHAT IT LOOKS LIKE AND EVERYTHING.

ANDERSON: SOME OIL, SOME OIL, SOME UM, DUFFEL BAGS, YOU KNOW WHAT I'M SAYING. THAT'S ABOUT IT.

OFFICER 1:   WHAT'S IN THE DUFFEL BAGS? I MEAN, JUST BE STRAIGHT UP, DUDE, (INAUDIBLE)

ANDERSON: I MEAN I SEEN A JUG OR SO IN THERE IN THE DUFFEL BAG (INAUDIBLE)

OFFICER 1:   DID IT HAVE A LIQUID IN IT?

ANDERSON: NO.

OFFICER 1:   WOULD YOU SAY PROBABLY METH LAB ITEMS? I MEAN (INAUDIBLE)

ANDERSON: IT, IT, IT, IT PROBABLY COULD, YES, YOU KNOW WHAT I'M SAYING, (INAUDIBLE) YES, (INAUDIBLE) YOU KNOW WHAT I'M SAYING.

(INAUDIBLE)

OFFICER 1:   SO YOU SAY ITS PROBABLY METH LAB ITEMS, RIGHT. DUDE, SPECIFICALLY, WHAT DID IT LOOK LIKE?

ANDERSON: WELL, WELL, THE ONE DUFFEL BAG, YOU KNOW, I JUST MOVED IT. (INAUDIBLE) SOME JUGS (INAUDIBLE)

OFFICER 1:   WHAT KIND OF JUGS ARE YOU TALKING ABOUT?

ANDERSON: JUST A LITTLE GALLON JUG OF SOME SHIT.

OFFICER 1:   GLASS OR PLASTIC?

ANDERSON: PLASTIC JUGS.

OFFICER 1:   DID THEY, UH, YOU DIDN'T TOUCH THE JUGS?

ANDERSON: I PUT EM IN A BAG AND SET EM OVER IN A CORNER BACK THERE WHEN I FIRST GOT HERE, YOU KNOW, LIKE I SAID, WHEN I WAS SWEEPING AND STUFF

OFFICER 1:   WHAT ELSE IS IN THE BAG IN THERE?

ANDERSON: THAT WAS IT, THAT I KNOW OF

OFFICER 1:   WAS THERE ANY LIQUID OR ANYTHING IN THERE?

ANDERSON: NO.

OFFICER 1:   WAS THERE ANYTHING HAZARDOUS IN THERE? I MEAN YOU KNOW, LIKE...

OFFICER 2:   THAT'S THE REASON WE'RE ASKING CAUSE

ANDERSON: AS FAR AS I KNOW OF, NO.

OFFICER 1:   I MEAN, IS THERE ANY COLEMAN FUEL IN THERE, MIXED UP IN SOME JUGS OR ANYTHING LIKE THAT?

ANDERSON: AS FAR AS I KNOW OF, NO

OFFICER 2: YOU WOULD PROBABLY WOULD SMELL IT IF THERE WAS.

ANDERSON: RIGHT, RIGHT, BUT I CAN'T SMELL NOTHING IN THERE (INAUDIBLE)

OFFICER 1: ETHER?

ANDERSON: NO, NO (INAUDIBLE)

OFFICER 2: COLEMAN FUEL?

OFFICER 1: ANY ANHYDROUS?

ANDERSON: NO, AIN'T NOTHING IN THERE LIKE THAT.

OFFICER 2: YOU SEE ANY PSEUDO POWDER OR ANYTHING LIKE THAT?

ANDERSON: UH, NO.

OFFICER 2: YOU SURE?

ANDERSON: I'M BEING, I'M BEING HONEST WITH YOU, I KNOW WHAT I'M SAYING, YEAH

OFFICER 2: I APPRECIATE YOU BEING HONEST, FOR REAL, I MEAN

ANDERSON: YEAH, YEAH, YEAH, (INAUDIBLE) AS FAR AS I KNOW, NO

OFFICER 1: BE SERIOUS DUDE, BE STRAIGHT UP WITH US AND WE'LL SEE WHAT WE CAN DO HERE.

ANDERSON: YEAH, ME TOO, ME TOO (INAUDIBLE)

OFFICER 2: I APPRECIATE YOU BEING HONEST, I MEAN, WHAT WE'RE, WHAT WE'RE FACED WITH IS THAT WE DON'T WANT NO ONE TO GET HURT SO IF YOU HAVE ANY KNOWLEDGE OF

(INAUDIBLE)

OFFICER 2: IS THERE ANY FUNNELS IN THERE OR ANYTHING LIKE THAT?

ANDERSON: I DON'T THINK SO.

OFFICER 2:   WHERE IS ALL THIS STUFF AT, BACK THERE IN THE BACK?

ANDERSON: YEA, BACK THERE IN THE BACK.

OFFICER 1:   LISTEN TO ME SEDRIC, OKAY. I'M I'M I'M A STRAIGHT UP GUY AND I
EXPECT YOU TO BE STRAIGHT UP TOO, OKAY. UM, IF THERE IS ANY
CHEMICALS IN THERE AND YOU HAVE ANY KNOWLEDGE OF THAT

ANDERSON: UH-HUH.

OFFICER 1:   OKAY, AND IF YOUR PRINTS ARE ON IT

ANDERSON: UH-HUH

OFFICER 1:   THEN THAT MEANS YOU HAVE KNOWLEDGE OF IT AND IF
SOMEBODY GETS HURT THEN YOU'RE GOING TO BE LOOKING AT
ADDITIONAL CHARGES,

ANDERSON: I UNDERSTAND. UH-HUH

OFFICER 1:   OKAY, THAT'S THE REASON WHY I AM ASKING THESE QUESTIONS.
ITS NOT ANY, THE REASON OF WE WANT TO KNOW WHAT WE ARE
DEALING WITH ....

ANDERSON: I UNDERSTAND.

OFFICER 1:   OKAY AND THIS STUFF, IS, I DON'T KNOW IF YOU KNOW, BUT, I
MEAN, THIS STUFF IS EXTREMELY HAZARDOUS. OKAY

OFFICER 2:   SOMETIMES IT CAN BE EXTREMELY DANGEROUS, YOU KNOW.

OFFICER 1:   IT CAN BE EVEN FATAL, OKAY SO I WANNA KNOW WHAT WE ARE
DEALING WITH, I MEAN IF YOU HEARD SOMEBODY TALK OR YOU
HAVE ANY KNOWLEDGE OF WHAT WE'RE DEALING WITH

ANDERSON: I'M SAYING I AIN'T HEARD NOBODY TALKING LIKE I SAID,
(INAUDIBLE) I SEEN HIM BUT YOU KNOW TALK TO HIM, SHIT LIKE
THAT, I AIN'T HEARD NOTHING LIKE THAT, YOU KNOW.

OFFICER 1:   IS THERE, YOU, YOU THINK THERE IS A LAB IN THAT BAG? A METH
LAB, YOU THINK, DO YOU SUSPECT THAT?
ANDERSON: I HOPE NOT CAUSE I MOVED THE BAG OVER THERE, YOU KNOW
WHAT I'M SAYING?

16.

OFFICER 2:   DO YOU THINK THERE MIGHT BE:

ANDERSON:  NOT, NO, THE DUFFEL BAGS WITH THE JUGS, NO, IT AIN'T NOTHING IN THOSE JUGS.

OFFICER 2:   DESCRIBE WHAT YOU ALL SAW, DESCRIBE SPECIFICALLY WHAT YOU SAW.

OFFICER 1:   FIRST OF ALL, BEFORE YOU SAY ANYTHING, IS THERE ANYBODY ELSE IN THERE?

ANDERSON:  NO, AIN'T NOBODY IN THERE BUT ME.

OFFICER 1:   OKAY, OKAY. ALRIGHT

OFFICER 2:   IS THERE ANYBODY ELSE IN THERE?

ANDERSON.  NO SERIOUSLY, HONESTLY, AIN'T NOBODY BUT ME HERE.

OFFICER 1:   OKAY. OKAY. GO AHEAD.

ANDERSON:  ONE BAG IN THE DUFFEL BAG, THERE WAS SOME JUGS, I MOVED THAT WHEN I FIRST GOT HERE...

OFFICER 2:   WHAT KIND OF JUGS

ANDERSON:  GALLON JUGS, LIKE I SAID

OFFICER 1:   OKAY.

ANDERSON:  GALLON JUGS AND THEY...

OFFICER 2:   ARE THEY EMPTY OR FULL?

ANDERSON:  AIN'T NOTHING IN EM.

OFFICER 2: (INAUDIBLE)

ANDERSON:  AIN'T NOTHING THERE WHATSOEVER, NO LIQUID, NO NOTHING IN EM

OFFICER 1:   OKAY

17.

ANDERSON: I JUST PICKED THEM UP PUT THEM IN A BAG AND SET THEM OVER THERE. CAME BACK OVER HERE AND GOT THE MOP. YOU KNOW WHAT I'M SAYING. AND DID A LITTLE YOU KNOW A LITTLE SWEEPING AND I MOPPED AROUND THAT STUFF AROUND THERE AND YOU KNOW. THAT WAS IT. LOADED THE DUFFLE BAG OVER THERE AND I DON'T KNOW WHAT'S IN THE DUFFLE BAG , YOU KNOW. I JUST MOVED IT.

OFFICER 1: IS IT HEAVY?

ANDERSON: YEAH, IT'S GOT SOME STUFF IN IT. IT'S HEAVY.

OFFICER 1: OPEN?

ANDERSON: (INAUDIBLE)

OFFICER 1: YOUR PRINTS GOING TO BE ON THAT STUFF THAT'S IN THERE? NOW COME ON NOW.

ANDERSON: IT SHOULDN'T BE. LIKE I SAID I PICKED...

OFFICER 1: I KNOW IT. I KNOW IT SHOULDN'T BE BUT IT'S PROBABLY GONNA BE. AND I JUST WANT YOU TO BE STRAIGHT UP ABOUT IT, OKAY?

ANDERSON: (INAUDIBLE)

OFFICER 1: (INAUDIBLE)

OFFICER 2: LISTEN TO ME NOW, I APPRECIATE YOUR HONESTY BUT YOUR HOLDING OUT ON ME. OKAY, I ALREADY KNOW THAT. LISTEN TO ME , LISTEN TO ME.

ANDERSON: I'M LISTENING, I'M LISTENING

OFFICER 2: YOU'RE HOLDING OUT ON ME. IF I'M IN A PLACE OKAY, AND, AND LIKE CLEANING THIS PLACE AND I FIND A BAG. I'M GOING TO LOOK AND SEE WHAT'S IN THE BAG. I MEAN YOU'RE HUMAN YOU'RE HUMAN. YOU'RE GONNA LOOK AND SEE WHAT'S IN THE BAG.

ANDERSON: TRUE, YOU KNOW WHAT I'M SAYING BUT, I TRY NOT TO GET INTO NOBODY'S BUSINESS. YOU SEE WHAT I'M SAYING.

OFFICER 2: OKAY, BUT I UNDERSTAND THAT BUT...

18.

ANDERSON: (INAUDIBLE) ... GET ME A FEW HOURS OF SLEEP, YOU KNOW WHAT I'M SAYING?

OFFICER 1: DID YOU SEE ANY PILLS IN THERE? LIKE GROUND UP OR ANYTHING LIKE THAT

ANDERSON: NO MAN

OFFICER 2: WHAT OTHER STUFF DID YOU SEE?

OFFICER 1: WHAT ELSE, IS LIKE... JUST SAY, I MEAN NOT SAYING THAT THIS IS GOING TO HAPPEN, JUST SAY WE WALKED BACK THERE RIGHT NOW WHAT ARE WE GOING TO SEE THAT'S IN PLAIN VIEW THAT'S REALLY GOING TO RAISE OUR SUSPENSION? I MEAN WHAT'S GONNA, WHAT'S GONNA STAND OUT. WHAT ARE WE GONNA SEE. AS FAR AS METH LAB ITEMS.

ANDERSON: METH LAB ITEMS?

OFFICER 1: YEAH

ANDERSON: HONESTLY, I DON'T KNOW ALL I CAN SAY IS IT'S SOME BAGS THAT I MESSED WITH, YOU KNOW WHAT I'M SAYING. AND THAT'S IT.(INAUDIBLE)

OFFICER 1: WHAT'S IN THE BAG?

ANDERSON: LIKE I SAID, GALLON JUGS IN ONE BAG, IN THE ONE BAG AND IN THE OTHER BAG IT' S UMMM, SOME, SOME BULLSHIT YOU KNOW WHAT I'M SAYING? HONESTLY.

OFFICER 1: LIKE WHAT? I MEAN WHAT KIND OF BULLSHIT? USED STUFF, ALREADY BEEN USED OR WHAT?

ANDERSON: LOOKS LIKE MOST OF IT IS BRAND NEW. LIKE HOSES AND STUFF LIKE THAT.

OFFICER 1: HOSES?

ANDERSON: YEAH, STUFF LIKE THAT.

OFFICER 1: WHAT ELSE? LIKE MAYBE BATTERIES OR...

ANDERSON: I DON'T KNOW. HONESTLY, I PICKED ALL THAT STUFF UP, YOU KNOW WHAT I'M SAYING. PUT IT ALL IN THAT BAG AND ZIPPED THE BAG UP.

19.

OFFICER 2: DID YOU SEE ANY BATTERIES?

ANDERSON: NO.

OFFICER 2: BE STRAIGHT WITH ME.

ANDERSON: I'M BEING...UMMM

OFFICER 2: THAT'S ALL WE'RE ASKING IS THAT YOU BE STRAIGHT WITH ME. THAT'S ALL I'M ASKING.

OFFICER 1: AND YOU'RE KINDA BEING, I MEAN YOU'RE TELLING US A LITTLE BIT. I MEAN I KNOW YOU MAY BE A LITTLE SCARED. BUT, I APPRECIATE YOUR BEING HONEST.

ANDERSON: I'M A LITTLE NERVOUS CAUSE YOU KNOW, IT AIN'T NONE OF MINE AND I DON'T WANT TO GET IN NO TROUBLE (INAUDIBLE)

OFFICER 2: THAT'S WHY WE'RE ASKING YA. OKAY, BUT IF WE GO IN THERE AND DISCOVER, IF WE GO IN THERE AND WE DISCOVER THERE'S A BUNCH OF STUFF IN THERE AND YOU'RE HOLDING OUT ON ME. IT AIN'T GONNA LOOK TO GOOD.

ANDERSON:I, I UNDERSTAND THAT TO.. YOU KNOW WHAT I'M SAYING CAUSE...

OFFICER 2: IT'S GONNA LOOK LIKE YOUR HIDING IT FROM ME

ANDERSON: RIGHT, RIGHT THEN YOU KNOW WHAT I'M SAYING. IT'S ALL GONNA COME BACK ON ME, SEE WHAT I'M SAYING?

OFFICER 1: WE JUST, WE JUST WONDERING YOU KNOW IF WE GO IN THERE, AND NOT SAYING THAT WE ARE. BUT IF WE DO. YOU KNOW, WHAT ARE WE, IS WHAT YOU'RE TELLING US WHAT WE'RE GONNA SEE OR ARE WE GONNA SEE A WHOLE LOT MORE?

ANDERSON: WHOLE LOT MORE OR LESS THAN WHAT, HONESTLY THOUGH. BE HONEST.

OFFICER 1: DRUG PARAPHERNALIA , METH LAB EQUIPMENT

ANDERSON: OK (INAUDIBLE) I'LL BE HONEST WITH WHAT I SEEN, AND WHAT I PICKED UP AND MOVED. I'LL BE HONEST WHICH YA.

OFFICER 1: OKAY, JUST WHATEVER YOU PICKED UP AN D MOVED TELL US.

ANDERSON: OK, I MOVED, I MOVED TWO DUFFEL BAGS WHEN I WENT BACK THERE AND GOT THE MOP.

OFFICER 1: ALRIGHT, YOU TOLD US THAT.

ANDERSON: ONE WAS IN THIS ROOM AND THE OTHER WAS IN THIS ROOM. HAD SOME UMMM, SOME HOSES, AND UMMM, I THINK A SOMETHING ELSE, SOMETHING LIKE PAPER TOWELS AND UH, SOME KIND OF CLOTH TOWELS AND SOME, UH (INAUDIBLE)

OFFICER 2: HEY ONE OF YA'LL TALK TO HIM. OVER THERE.

OFFICER 1: OKAY WHAT ELSE?

ANDERSON: UH,

OFFICER 2: PILL POWDER, DID YOU SEE ANY PILL POWDER?

ANDERSON: NO, NO PILL POWDER. NOT TO MY KNOWLEDGE

OFFICER 2: BATTERIES, SEE ANY BATTERIES? (INAUDIBLE)

ANDERSON: UH, NO, I'M TRYING, I THINK I SEEN SOME UH, DOUBLE A UH,

OFFICER 1: (INAUDIBLE)

ANDERSON: DURACELL BATTERIES OR SOMETHING IN THERE.

OFFICER 1: (INAUDIBLE)

ANDERSON: COPPER TOP (INAUDIBLE) AND I PUT THOSE IN THERE TOO. CAUSE I FIGURE EVERYTHING

OFFICER 2: (INAUDIBLE)

OFFICER 2:(INAUDIBLE) SALT

ANDERSON: THERE'S SOME SALT IN THERE I POURED OUT, YOU KNOW WHAT I'M SAYING.

OFFICER 2: ACID?

ANDERSON: ACID, UH, I DON'T EVEN KNOW. (INAUDIBLE)

21.

OFFICER 1: WHY DID YOU POUR THE SALT OUT? THAT'S KINDA...

ANDERSON: CAUSE ALL THAT SHIT WAS IN THERE MAN, HONESTLY I WAS LIKE MAN...

OFFICER 1: WAS IT IN AN ACTUAL SALT CONTAINER?

ANDERSON: YEAH, IT WAS IN A SALT CONTAINER.

OFFICER 1: WHERE DID YOU POUR IT OUT AT?

ANDERSON: IN THE GARBAGE CAN. YEAH, YEAH.

OFFICER 1: OH REALLY? WHAT DID YOU POUR IT OUT FOR?

ANDERSON: I WAS JUST CLEANING UP STUFF, YOU KNOW WHAT I'M SAYING. (INAUDIBLE)

OFFICER 1: SO WHAT MADE YOU ACTUALLY COME OUT HERE. CAUSE WE'VE BEEN OUT HERE FOR A LITTLE WHILE.

ANDERSON: (INAUDIBLE) LIKE I SAID, ME AND MY GIRL (INAUDIBLE)

OFFICER 1: DID YOU FLUSH ANYTHING DOWN THE TOILET. ANY CHEMICALS

ANDERSON: NO LIKE I TOLD HIM, THE ONLY TIME I FLUSHED THE TOILET WAS WHEN I TOOK A SHIT EARLIER

OFFICER 1: DID YOU SEE ANY DOPE BACK THERE? ANY METH?

ANDERSON: NO

OFFICER 1: STRAIGHT UP?

ANDERSON: STRAIGHT UP.

OFFICER 2: SO THAT STUFF IN THE BAG THOUGH, YOU, I MEAN YOU'VE SEEN PEOPLE (INAUDIBLE) METH LAB STUFF.

ANDERSON:.IT, IT COULD BE USED FOR METH LAB STUFF. YES, IT COULD BE.

OFFICER 1: WAS THAT YOUR IMPRESSION? IS THAT WHAT YOU THOUGHT IT COULD BE EN.

22.

ANDERSON: HONESTLY, I NEVER KNEW OF ANYBODY OUT HERE THAT THEY HANG THAT WOULD DO ANYTHING LIKE THAT. SO I'M NOT GONNA SAY THAT. I'M NOT GONNA ASSUME NOTHING.

OFFICER 1: THAT'S RIGHT

ANDERSON: (INAUDIBLE)

OFFICER 2: YOU KNEW WHAT, YOU KNOW WHAT THAT STUFF IS, I MEAN YOU KNOW

ANDERSON: THAT'S THE REASON, THAT'S THE REASON I PUT STUFF BACK OVER IN THAT CORNER I TRIED TO CALL HIM I DIDN'T GET NO ANSWER. YOU SEE WHAT I'M SAYING?

OFFICER 1: OKAY

ANDERSON: I LAID DOWN AND WENT TO SLEEP. I WASN'T, WASN'T THINKING ABOUT IT HONESTLY.

OFFICER 2: (INAUDIBLE)

OFFICER 1: (INAUDIBLE)

ANDERSON: I DIDN'T THINKING NOTHING ABOUT IT. YOU KNOW WHAT I'M SAYING.

OFFICER1: OKAY.

ANDERSON: I WENT TO SLEEP.

OFFICER 2: (INAUDIBLE)

OFFICER 1: HUH?

OFFICER 2: (INAUDIBLE)

OFFICER I: OKAY, ALRIGHT

OFFICER 1: HE'S ALREADY READ YOU YOUR RIGHTS. I'M GONNA READ 'EM TO YOU AGAIN. OKAY.

ANDERSON: DUDE READ EM TO ME OVER THERE

23.

OFFICER 1: OKAY. YOU HAVE THE RIGHT TO REMAIN SILENT. ANYTHING THAT YOU SAY CAN AND WILL BE USED AGAINST YOU IN A COURT OF LAW. YOU HAVE THE RIGHT TO TALK TO A LAWYER AND HAVE HIM PRESENT WITH YOU WHILE YOU'RE BEING QUESTIONED. IF YOU CANNOT AFFORD TO HIRE A LAWYER ONE WILL BE APPOINTED TO REPRESENT YOU. BEFORE ANY QUESTIONING IF YOU WISH. YOU CAN DECIDE AT ANY TIME TO EXERCISE THESE RIGHTS AND NOT ANSWER ANY QUESTIONS OR MAKE ANY STATEMENTS. DO YOU UNDERSTAND?

ANDERSON: (INAUDIBLE)

OFFICER 1: DO WHAT?

ANDERSON: YEAH, YEAH.

OFFICER 1: (PHONE RINGING) HELLO. YEAH, HI, THIS IS DEPUTY BAXTER WITH THE SHERIFF'S OFFICE IN CRAIGHEAD COUNTY. UP IN JONESBORO. CRAIGHEAD. (INAUDIBLE)

OFFICER 2: (INAUDIBLE)

OFFICER 1: YEAH, I DON'T THINK HE BELIEVED US. UHH, ALRIGHT. YOU UNDERSTAND YOUR RIGHTS? RIGHT?

ANDERSON: (INAUDIBLE)

OFFICER 1: HUH?

ANDERSON: YEAH

OFFICER 1: I JUST UHH, I MEAN YOU KNOW WE WENT INSIDE THERE RIGHT. WE FOUND SOME OF THE THINGS YOU WERE TALKING ABOUT. BUT I WANT TO KNOW YOU TOLD ME THAT YOU POURED THE SALT OUT, RIGHT. TELL ME WHAT ELSE YOU POURED OUT IN THERE BEFORE YOU POURED THE SALT OUT. I KNOW THERE'S SOME PILL POWDER IN THERE I CAN TELL. HOW MUCH, HOW MUCH WAS IT?

ANDERSON: IF THAT'SPILL POWDER. I HONESTLY DON'T KNOW WHAT THAT WAS. I'M BE HONEST WHICH YA MAN.

OFFICER 1: YOU JUST SEEN THE BAG WITH THE POWDER IN IT?

ANDERSON: (INAUDIBLE) YEAH, JUST LIKE I WAS TELLING HIM. I SAID, HE WAS TELLING ME THAT (INAUDIBLE) AND THIS AND THAT. I WAS TELLING HIM WELL, I

24.

KNOW WHAT I DID. YOU SEE WHAT I'M SAYING.

OFFICER 1: YEAH. SO YOU KNEW IT WAS WRONG, RIGHT?

ANDERSON: WRONG, I, WELL WRONG AS IN WHOEVER IT IS YOU KNOW.

OFFICER 1: YEAH

ANDERSON: I WAS POURING THE SHIT OUT. YOU KNOW WHAT I'M SAYING? CAUSE I....

OFFICER 1: JUST THE BAG? I MEAN HOW MANY BAGS OF THE WHITE POWDER DID YOU POUR OUT?

ANDERSON: JUST ONE MAN, (INAUDIBLE)

OFFICER 1: JUST ONE? ALRIGHT I APPRECIATE IT.

ANDERSON: (INAUDIBLE) MAN.

OFFICER 1: I APPRECIATE YOU BEING COOL. OKAY.

ANDERSON: ALRIGHT

OFFICER 1: I'M GONNA BE HONEST WITH YOU TOO. OKAY I DON'T HAVE ANY REASON TO LIE TO YOU AND I APPRECIATE YOU NOT LYING TO ME. HOW MUCH, IS THERE ANY ACTUAL DOPE? ANY FINISHED PRODUCT? (INAUDIBLE)

ANDERSON: OF I KNOW OF THAT'S IN THAT BUILDING. I DON'T KNOW. I DIDN'T BRING ANYTHING OUT HERE, HONESTLY.

OFFICER 1: HOW ABOUT THE LITHIUM STRIP FROM THE ATM? YOU PUT THEM UP THERE BEHIND THE...

ANDERSON: (INAUDIBLE)

OFFICER 1: WHAT'D YOU DO THAT FOR?

ANDERSON: CAUSE I WAS TRYING TO FIND OUT WHO (INAUDIBLE) WAS. I AIN'T GOING TO LIE TO YOU MAN. CAUSE HE'S TELLING ME THAT DUDE TOLD HIM THAT HE AIN'T TALKING AND I BEEN TRYING TO CALL THIS DUDE ALL NIGHT MAN. TRYING TO FIND OUT WHAT'S GOING ON. YOU SEE WHAT I'M SAYING?

OFFICER 1: WHERE THERE AIN'T NO PLACE FOR YOU TO SLEEP IN THERE. SO I KNOW YOU...

ANDERSON: NO, NO, NAH I WAS IN THERE ON THE CHAIR LAYING MY HEAD ON DEM, ON THE THING. WHEN I TURNED AROUND AND LOOKED AT THE MONITOR I SEEN THE LIGHT COME THROUGH YOU KNOW. AND I LOOKED DOWN AT THE DOOR SO I WOKE UP AND I CAME OPEN THE DOOR FOR YOU. YOU KNOW WHAT I'M SAYING?

OFFICER 1: WE'VE BEEN OUT HERE FOR A WHILE THOUGH.

ANDERSON: I BEEN ASLEEP EVER SINCE ABOUT NINE, NINE-THIRTY THOUGH. SERIOUSLY.

OFFICER 1:HMMM.

ANDERSON: (INAUDIBLE)

OFFICER 1: DO YOU USE DOPE OR YOU JUST COOK IT?

ANDERSON: NO SIR, I DON'T DO EITHER ONE.

OFFICER: I KNOW YOU KNOW HOW TO COOK SEDRIC, NOW COME ON NOW.

ANDERSON: I KNOW PEOPLE. I'M GONNA SAY THAT.

OFFICER 1: (INAUDIBLE) YOU'VE BEEN HONEST WITH ME SO I APPRECIATE THAT. I KNOW YOU'RE SCARED AND STUFF. BUT IT AIN'T NO SECRET THAT YOU KNOW HOW TO COOK, RIGHT?

ANDERSON: IT MUST BE A SECRET. CAUSE I CAN'T TELL YOU NOTHING. I CAN JUST TELL YOU I KNOW PEOPLE AND WHAT I HEARD YOU KNOW WHAT I'M SAYING?

OFFICER 1: YOU DON'T USE IT THOUGH?

ANDERSON: NO.

OFFICER 1: WOULD YOU TEST POSITIVE FOR IT RIGHT NOW?

ANDERSON: I SHOULDN'T. I DON'T GET HIGH MAN.

OFFICER 1: OKAY, THAT'S COOL. YOU HAVE A WALLET OR ANYTHING IN THERE?

26.

ANDERSON: WHAT I GOT, WHAT'S ON ME, THAT'S WHAT I GOT.

OFFICER 1: WHERE'S YOUR WALLET AT IN THERE?

ANDERSON: I DON'T HAVE NO WALLET. I NEVER SAID I HAD A WALLET. NEVER.

OFFICER: YOU DON'T HAVE ANY ID OR ANYTHING IN THERE?

ANDERSON: NO. NO.

OFFICER 1: ANY MONEY?

ANDERSON: MY MONEY'S, MY MONEY'S IN MY POCKET.

OFFICER 1: HOW MUCH MONEY YOU GOT ON YOU?

ANDERSON: PROBABLY ABOUT A HUNDRED FORTY-FIVE HUNDRED FIFTY DOLLARS, THAT'S IT.

OFFICER 1: (INAUDIBLE)

ANDERSON: LIKE I TOLD HIM ONLY THING I GOT. IT'S ON ME.

OFFICER 1: YOU GOT ANYTHING ILLEGAL IN YOUR TRUCK?

ANDERSON: THERE BETTER NOT BE NOTHING IN MY TRUCK. HONESTLY.

OFFICER 1: CAN I SEARCH IT?

ANDERSON: I DON'T CARE THE DOORS UNLOCKED.

OFFICER 1: IS IT?

ANDERSON: THEY SHOULD'VE BEEN

OFFICER 1: OK, I , I AIN'T CHECKED IT. I DON'T KNOW

ANDERSON: (INAUDIBLE) I LEFT THEM UNLOCKED. YOU KNOW WHAT I'M SAYING?

OFFICER 1: OKAY.

ANDERSON: BECAUSE IT'S SO HARD TO UNLOCK.

OFFICER 1: OKAY, ALRIGHT. AND YOU DON'T' CARE IF I SEARCH IT?

ANDERSON: NO, NO.

OFFICER 1: EVERYTHING IN THERE BELONG TO YOU?

ANDERSON: WELL, I'M , IT'S MY TRUCK (INAUDIBLE) I LET MY SISTER DRIVE BACK AND FORTH TO WORK.

OFFICER 1: DID YOU DRIVE IT UP HERE?

ANDERSON: YEAH, I DROVE IT UP HERE.

OFFICER 1: DID YOU HAVE SOME BLACK BAGS IN IT WHENEVER YOU GOT HERE? YOU KNOW WE GOT...

ANDERSON: BLACK BAGS? NAW, NO IT AIN'T NO BLACK BAG IN THE TRUCK. (INAUDIBLE)

OFFICER 1: (INAUDIBLE) I MEANT THE DUFFEL BAGS THAT WERE IN THERE. DID YOU BRING THEM HERE?

ANDERSON: NO, THEM BAGS WERE HERE.

OFFICER 1: YOU KNOW THERE'S VIDEO TAPE. THERE'S CAMERAS THERE'S TWO OR THREE CAMERAS.

ANDERSON: YEAH, I KNOW THAT. YEAH, I KNOW THAT.

OFFICER 1: ARE THEY GOING TO BE. ARE THEY GOING TO HAVE YOU ON TAPE CARRYING THEM BAGS IN?

ANDERSON: THEY SHOULDN'T HAVE ME ON TAPE. (INAUDIBLE)YOU CAN LOOK AT THE TAPE. YOU KNOW WHAT I'M SAYING? (INAUDIBLE). YOU KNOW WHAT I'M SAYING.

OFFICER 1: HOW ABOUT THE MANAGER HERE? DOES HE KNOW ABOUT IT, ALL THAT STUFF?

ANDERSON: I'M BE HONEST WHICH YA.  I DON'T KNOW. THAT WHY I WAS TRYING TO FIND HIM TRYING TO FIND OUT WHAT THE FUCK'S GOING ON.

OFFICER 1: HMMM, WHAT WAS YOU DOING BACK THERE (INAUDIBLE)

28.

ANDERSON: LIKE I SAID, I SEEN THAT DAMN, THAT A LITTLE TANK RIGHT THERE MAN. I LOOKED AROUND, I STEPPED AROUND, I'M LIKE MAN

OFFICER 1: YOU WENT ACTUALLY WENT IN THERE DIDN'T HE?

ANDERSON: I STEPPED

OFFICER 1: YOU OPENED UP

ANDERSON: I STEPPED RIGHT AT THAT DOOR. I WAS LIKE MAN. YOU KNOW WHAT I'M SAYING (INAUDIBLE)

OFFICER 2: WHY'D YOU LOCK IT BACK?

ANDERSON: CAUSE IT WASN'T MY SHIT.  YOU SEE WHAT I'M SAYING?

OFFICER 2: WHERE'S THE KEY TO IT AT?

ANDERSON: ACTUALLY I DON'T KNOW. I DON'T HAVE A KEY. THESE THE ONLY KEYS I HAVE. TO BE HONEST WHICH YA.

OFFICER 2: YOU LOCKED THE DOOR BACK. I MEAN (INAUDIBLE)

ANDERSON: YEAH, BECAUSE I'M TRYING, I'M TRYING TO CALL THIS MAN. FIND OUT WHAT THE FUCK'S GOING ON. YOU KNOW WHAT I'M SAYING.

OFFICER 2: HOW'D YOU UNLOCK IT?

ANDERSON: THE MOTHER FUCKER WAS UNLOCKED WHEN I WAS HERE. HONESTLY. WHEN I SEEN THAT DAMN THING I WALKED BACK THERE. YOU SEE WHAT I'M SAYING. I'M LIKE OH FUCK.

OFFICER 1: WHY DIDN'T YOU LEAVE? I MEAN. YOU SEE WHAT I'M SAYING. I'M JUST HAVING A HARD TIME BELIEVING

ANDERSON: (INAUDIBLE) I UNDERSTAND WHAT YOUR SAYING. YOU KNOW WHAT I'M SAYING, BUT I'M TRYING TO CALL HIM FIND OUT WHAT'S GOING ON YOU KNOW WHAT I'M SAYING. I CAN'T GET NO ANSWER (INAUDIBLE)

OFFICER 1: SO YOU SEEN US COMING UP HERE AND THAT'S WHEN YOU STARTED POURING EVERYTHING OUT AND HIDING EVERYTHING.

ANDERSON: NO SIR, I WAS ASLEEP

29.

OFFICER 1: WHEN DID YOU DO ALL THIS OTHER?

ANDERSON: (INAUDIBLE) WHEN I FIRST GOT HERE. I'VE BEEN CALLING HIM FOR THE LONGEST. I DIDN'T GET NO ANSWER. LIKE I TOLD YA'LL FIRST. I BEEN CALLING HIM EVER SINCE I GOT HERE. WHEN I WAS IN THERE SWEEPING THE FLOORS AND SHIT.

OFFICER 1: HUH. DO YOU HAVE ANY DRUGS ON YOU?

ANDERSON: NO SIR.

OFFICER 1: NONE AT ALL. DO YOU MIND IF I SEARCH YOUR POCKETS?

ANDERSON: GO HEAD MAN. GO HEAD.

OFFICER 1: HAVE YOU BEEN SEARCHED YET?

ANDERSON: YEAH, ABOUT THREE OR FOUR TIMES.

OFFICER 1: HAVE YOU REALLY? OKAY, I'M SORRY. I DIDN'T KNOW THAT.

ANDERSON: (INAUDIBLE)

OFFICER 1: YOU JUST GOT UNDERWEAR IN THE BACK.

ANDERSON: (INAUDIBLE)

OFFICER 2: YOU DON'T HAVE ANY (INAUDIBLE) IN THERE. THERE AIN'T NO GUNS OR NOTHING LIKE THAT IN YOUR TRUCK RIGHT?

OFFICER 1: (INAUDIBLE) NOTHING ILLEGAL IN YOUR TRUCK AT ALL?

ANDERSON: BETTER NOT BE. HONESTLY, NO IT BETTER NOT BE.

OFFICER 1: I CAN GO OVER THERE AND SEARCH IT?

ANDERSON: YEAH, GONNA WALK OVER THERE?

OFFICER 1: YEAH, YOU CAN GO OVER THERE WITH ME IF YOU WANT TO. CHRIS HE'S GONNA, LET ME SEARCH HIS TRUCK. I'M GONNA TAKE HIM OVER THERE AND DO THAT.

ANDERSON: THIS DOOR RIGHT HERE SHOULD BE OPEN.

30.

OFFICER 1: WHICH ONE? THE DRIVER'S SIDE?

ANDERSON: (INAUDIBLE)

OFFICER 1: OKAY. YEAH, YOU SAID YOU DON'T LIVE HERE IN JONESBORO ANYWHERE?

ANDERSON: NO, I USED TO.

OFFICER 1: OH, OKAY. NOTHING UNDER THE HOOD?

ANDERSON: NO, THIS IS...(INAUDIBLE)

OFFICER 1: OKAY, OKAY.

ANDERSON: (INAUDIBLE)

OFFICER 1: ALRIGHT. COOL MAN. ( PAUSE) WHAT TIME DID YOU SAY YOU GOT HERE AT THIS BUSINESS TONIGHT?

ANDERSON: ABOUT SEVEN-THIRTY, ALMOST EIGHT.

OFFICER 1: WHAT TIME'D YOU GO TO SLEEP?

ANDERSON: ABOUT NINE THIRTY.

OFFICER 1: SO WHAT'D YOU DO IN BETWEEN ALL THAT TIME?

ANDERSON: TRY TO CALL HIM ON THE PHONE. I TRIED TO CALL MY GIRL. UM, (INAUDIBLE) SWEEP AND MOPPED AND SHIT IN THERE OR SOME SHIT. EXACTLY WHAT I TOLD YOU EARLIER MAN.

OFFICER 1: SO ALL YOU POURED OUT WAS ONE BAG OF PILL POWDER. IN THE TRASH CAN. IS THAT RIGHT? HUH, IT IS. ALRIGHT. THERE'S SOME OTHER BAGS EMPTY BAGS IN THERE TOO. WHAT WERE THOSE?

ANDERSON: IS IT?

OFFICER 1:WERE THEY JUST EMPTY? OR

ANDERSON: I GUESS. I

31.

OFFICER 1: WERE YOU JUST POURING THE SALT ON THERE TO TRY AND HIDE IT OR WHAT. CAUSE THERE'S A LOT MORE SALT IN THOSE BAGS THAT WERE STILL FULL.

ANDERSON: WAS IT?

OFFICER 1: (INAUDIBLE)

ANDERSON: (INAUDIBLE) I DON'T KNOW. I DON'T KNOW (INAUDIBLE)

OFFICER 1: WHY'D YOU POUR THE SALT ON TOP OF IT? JUST TRYING TO HIDE THE PILL POWDER?

ANDERSON: YEAH, AND THEN WHOEVER'S SHIT IT WAS (INAUDIBLE)

OFFICER 1: IS THERE ANY DOPE? IS IT, I MEAN WERE GOING TO DIG THAT TRASH CAN OUT.

ANDERSON: YA'LL CAN DIG THAT TRASH CAN (INAUDIBLE)

OFFICER 1: IS THERE ANY DOPE IN BOTTOM OF IT, STRAIGHT UP?

ANDERSON: NO, NOT THAT I KNOW OF NO. I'M JUST TELLING YOU HONESTLY WHAT I DID. (INAUDIBLE)

OFFICER 1: WHAT WAS IN THAT BLACK SHAVING BAG?

ANDERSON: I DON'T KNOW. IT WAS EMPTY WHEN I SEEN IT. IT WAS ON THE DESK SO I LAID IT UP THERE.

OFFICER 1: IT WAS EMPTY. THERE WASN'T ANY DOPE IN THERE AT ALL?

ANDERSON: WASN'T NOTHING IN THAT BAG MAN.

OFFICER 1: WHERE'S THE DOPE AT THAT WAS IN THERE?

ANDERSON: (INAUDIBLE)

OFFICER 1: WHERE'S THE ACTUAL METH AT THAT WAS IN THERE?

ANDERSON: I DON'T KNOW IF IT'S IN THERE. I'M BEING HONEST WITH YA. SERIOUSLY. NO BULL SHIT.

32.

OFFICER 1: YOU DIDN'T STASH IT ANYWHERE?

ANDERSON. I DIDN'T STASH NO DOPE. I AIN'T SEEN NO DOPE OR NOTHING WHATSOEVER.

OFFICER 1: YOU STASHED THE BATTERIES THOUGH. RIGHT.

ANDERSON: YEAH, I DID THAT. BUT I'M TRYING TO TELL YOU HONESTLY, IT WAS NOT NO DOPE AND I DID NOT SEE NO DOPE HONESTLY.

OFFICER 1:ALRIGHT, YOU STASHED THE BATTERIES, THE PILL POWDER AND WHAT ELSE?

ANDERSON: (INAUDIBLE)

OFFICER 1: WHAT ELSE? JUST TELL ME.

ANDERSON: THEM BAGS

OFFICER 1: I MIGHT HAVE MISSED SOMETHING.

ANDERSON: COME ON MAN.(INAUDIBLE)

OFFICER 1: YOU SEE WHAT I'M SAYING.

ANDERSON: I SEE WHAT YOU'RE SAYING (INAUDIBLE)

OFFICER 1: I WANT TO FIND EVERYTHING, RIGHT?

ANDERSON: I UNDERSTAND WHAT YOU'RE SAYING. BUT WHATEVER YOU SEE IN THERE. THAT'S WHAT I'M TRYING TO TELL YOU. HONESTLY MAN.

OFFICER 1: BUT WHAT ELSE DID YOU HIDE? ALRIGHT

ANDERSON: THAT'S IT.

OFFICER 1: (INAUDIBLE)

ANDERSON: THAT'S IT. EXACTLY WHAT WE DISCUSSING. THAT'S EVERYTHING.

OFFICER 1: THERE'S ONE MORE THING.

ANDERSON: IF THERE'S ONE MORE THING IN THERE I DON'T KNOW. (INAUDIBLE)

33.

OFFICER I: COME ON NOW. WHAT ABOUT THE COOLER TELL ME ABOUT IT.

ANDERSON: WHAT ABOUT THE COOLER?

OFFICER 1: WITH THE ACID IN IT? WHERE'D IT COME FROM?

ANDERSON: IT WAS BACK THERE. I MOVED IT. I MOVED IT OUT THE DOORWAY.

OFFICER 1: WHAT DOOR WAY?

ANDERSON: (INAUDIBLE)

OFFICER 1: THE BACK ONE?

ANDERSON: YEAH.

OFFICER 1: DID YOU PUT THE DUFFEL BAG BACK THERE?

ANDERSON: BACK HERE?

OFFICER 1: YEAH

ANDERSON: THE DUFFEL BAG THEY WAS,(INAUDIBLE) THEY WAS IN THERE. AND I PICKED UP THE JUG THAT WAS OUT THERE AND I PUT THEM IN THERE. AND I PICKED THEM , THEM OTHER ONE'S WAS IN THERE LAYING ON THE FUCKING FLOOR. I PICKED THEM UP AND MOVED THE OTHER BAG.

OFFICER 1: HANG TIGHT THERE.

ANDERSON: (INAUDIBLE)

OFFICER 1: JUST TELL ME WHAT'S IN THE BUCKET OKAY. I WANNA KNOW ALRIGHT. BEFORE I GET HURT.

ANDERSON: THERE'S SUPPOSED TO BE SOME DOPE RIGHT THERE. THERE SUPPOSEDLY MAKING SOME DOPE OR WHATEVER.

OFFICER 2: (INAUDIBLE)

ANDERSON: (INAUDIBLE)

OFFICER 2: (INAUDIBLE)

OFFICER 1: NO, IT'S PROBABLY FROM THE RED PILLS.

ANDERSON: (INAUDIBLE)

OFFICER 1: RED PILLS

OFFICER 2: (INAUDIBLE)

OFFICER 1: THESE RED PILLS? (INAUDIBLE)

ANDERSON: (INAUDIBLE) I JUST MOVED THE MOTHER FUCKER'S SERIOUSLY MAN.

OFFICER 1: YOU MOVED THE FIVE GALLON BUCKET.

ANDERSON: MOVED IT. I MOVED IT AWAY FROM THAT DOOR. CAUSE THAT DOOR WAS OPENED AND I SMELLED IT AND I WALKED AROUND THERE.

OFFICER 2: (INAUDIBLE)

OFFICER 1:(INAUDIBLE) WHAT ALL'S IN IT?

ANDERSON: I KNOW WHAT IT SMELLS LIKE TO ME. SEE WHAT I'M SAYING. BUT I MOVED THE SON-OF-A-BITCH. AND I LOCKED THE MOTHER FUCKER AND I WAS TRYING TO CALL HIM.

OFFICER 1: COME ON NOW.

ANDERSON: I'M BEING HONEST WITH YOU MAN. GODDAMN.
OFFICER 1: COME ON NOW.

ANDERSON: (INAUDIBLE)

OFFICER 1: (INAUDIBLE) YOU SAY. IT SHOULDN'T BE NO MORE THAN ONE CASE OF PILLS. HOW MANY BATTERIES?

ANDERSON: (INAUDIBLE) MAYBE THIRTY OR FORTY SOMETHING LIKE THAT.

OFFICER 1: THIRTY, FORTY BATTERIES. HOW MUCH PILL, HOW MANY, HOW MANY ACTUAL PILLS IN A CASE FIVE HUNDRED, NO THERE'S TWO THOUSAND. WHAT IS IT TWO THOUSAND FIFTY SOMETHING?

ANDERSON: (INAUDIBLE)

35.

OFFICER 1: A LITTLE OVER TWO THOUSAND PILLS, FORTY SOMETHING BATTERIES. HOW MUCH GAS HAS BEEN PUT IN THERE?

ANDERSON: NOT MUCH

OFFICER 1: HALF GALLON?

ANDERSON: NOT EVEN THAT MUCH.

OFFICER 1: NOT EVEN THAT MUCH. IS THAT ALL? YOU DIDN'T PUT NOTHING ELSE IN THERE? IS THAT THE WAY IT ALWAYS BUBBLES UP THERE AT THE TOP LIKE THAT? THAT BRONZE COLOR?

ANDERSON:(INAUDIBLE)

OFFICER 1: OKAY. HOW MUCH DOPE WILL THAT MAKE?

ANDERSON: ACTUALLY, I REALLY DON'T KNOW. I JUST KNOW WHAT A PERSON TOLD ME. MAN.

OFFICER 1: ALRIGHT, WHAT'D THEY TELL YOU? HOW MUCH WILL IT MAKE?

ANDERSON: THEY SAID A FEW OUNCES.

OFFICER 1: THREE OR FOUR? THAT'S A LOT OF MONEY. AIN'T IT?

ANDERSON: (INAUDIBLE)

OFFICER 2: SEDRIC, THAT JACKET OUT THERE IN THAT SHED. IS THAT YOURS. KINDA OF BIG. ABOUT YOUR SIZE.HUH?

ANDERSON: NO, I DON'T GOT NO CLOTHES HERE. THIS IS THE ONLY CLOTHES I GOT HERE.

OFFICER 2:THAT AIN'T YOUR JACKET BACK THERE? COME ON NOW.

ANDERSON: (INAUDIBLE)

OFFICER 2: IT AIN'T GONNA HAVE YOUR HAIR PARTICLES ON THE BACK OF IT?

ANDERSON: (INAUDIBLE)

OFFICER 2: HUH?

36.

ANDERSON: NOPE

OFFICER 2: OKAY

ANDERSON: (INAUDIBLE)

OFFICER 1: (INAUDIBLE) YEAH, LET ME GET ALL THAT STUFF OUT OF THERE AND I'LL LET YOU GO. OKAY. SEDRIC, (INAUDIBLE) THEY LET YOU GO TO THE BATHROOM DIDN'T THEY?

ANDERSON: (INAUDIBLE)

OFFICER 1: OKAY NO PROBLEM. (INAUDIBLE) ABOUT WHAT TIME WAS YOU AT WALMART EARLIER?

ANDERSON: (INAUDIBLE)

OFFICER 1: (INAUDIBLE)

ANDERSON: (INAUDIBLE)

OFFICER 2: I CAN'T HEAR WHAT YOU'RE SAYING.

ANDERSON: I SAID BEFORE DARK OR RIGHT AT DARK.

OFFICER 2: WHICH ONE WAS IT?

ANDERSON: THE ONE ON HIGHLAND.

OFFICER 1: WHAT ALL DID YOU BUY?

ANDERSON: (INAUDIBLE)

OFFICER 1: DID YOU BUY SOME OF THEM BIG PLASTIC CONTAINERS?

ANDERSON: NO (INAUDIBLE)

OFFICER 2: BATTERIES?

ANDERSON: NO (INAUDIBLE)

OFFICER 1: DUCT TAPE?

37.

ANDERSON: YEAH

OFFICER 1: DID YOU PUT THAT DUCT TAPE ON THAT BLUE BUCKET OUT THERE YOURSELF. TRY TO MAKE IT SEAL?

ANDERSON: (INAUDIBLE)

OFFICER 1: OKAY

ANDERSON:(INAUDIBLE)

OFFICER 1: TRYING TO KEEP THE SMELL DOWN? IS THAT WHY YOU DID IT?

ANDERSON: (INAUDIBLE)

OFFICER 1: OKAY, WHAT ELSE DID YOU BUY?

ANDERSON: (INAUDIBLE) I BOUGHT ME A DVD.

OFFICER 1: YOU KNOW THEY GOT CAMERA'S UP THERE AT WALMART. SO

ANDERSON: YEAH, YEAH, YEAH, I KNOW THAT.

OFFICER 1: DID YOU BUY A WOODEN SPOON?

ANDERON: NOPE (INAUDIBLE)

OFFICER 2: (INAUDIBLE)

ANDERSON: NO

OFFICER 1: ANY LITHIUM BATTERIES?

ANDERSON: NOPE

OFFICER 1: NONE?

ANDERSON: NO, NO PILLS. NOPE

OFFICER 2: COLMAN FUEL (INAUDIBLE)

ANDERSON: NO, NOPE NONE OF THAT.

38.

OFFICER 2: (INAUDIBLE)

ANDERSON: (INAUDIBLE)

ANDERSON: ETHER I THINK

OFFICER 1: ETHER?

ANDERSON: ETHER I THINK.

OFFICER 1: WHERE'S THE STARTER FLUID CANS AT?

ANDERSON: I DON'T KNOW ABOUT THAT. I DON'T EVEN KNOW.

OFFICER 1:ALRIGHT.

OFFICER 2: IF WE WALK BACK THERE BEHIND THE (INAUDIBLE) WE GONNA FIND THEM?

ANDERSON: SHOULDN'T. I DON'T KNOW. I AIN'T SEEN NOTHING BACK THERE SO YOU SHOULDN'T.

OFFICER 2:(INAUDIBLE)

ANDERSON: I KNOW, I KNOW WHAT YOU'RE SAYING.

OFFICER 2: IF WE FIND THEM (INAUDIBLE) IF YOUR PRINTS ARE ON THEM (INAUDIBLE)

ANDERSON: I SEE, I SEE WHAT YOU'RE SAYING

OFFICER 2: (INAUDIBLE)

ANDERSON: HONESTLY, I DON'T KNOW. SERIOUSLY I DON'T KNOW. (INAUDIBLE) THE STUFF WAS IN THERE. ALL THAT STUFF WAS RIGHT THERE I GUESS IN THE BUCKET

OFFICER 1: YOU DIDN'T BUY, YOU DIDN'T BUY NONE OF THAT STUFF THAT WE FOUND IN THERE AT WALMART. NO BIG CONTAINER? ANY SALT?

ANDERSON: NO SIR

OFFICER 2: (INAUDIBLE) GLOVES?

39.

ANDERSON: I BOUGHT SOME GLOVES A LONG TIME AGO AT WALMART. MONTHS AGO.

OFFICER 1: WHAT'D YOU BUY THEM FOR?

ANDERSON: THE GLOVES? I BUY GLOVES ALL THE TIME BECAUSE I BE PAINTING AND STUFF.

OFFICER 1: YOU BUY A BUNCH OF GLOVES?

ANDERSON: YEAH, I GOT A BUNCH OF GLOVES.

OFFICER 2: (INAUDIBLE) WE CALL WALMART (INAUDIBLE)

ANDERSON: THEY MIGHT MATCH UP CAUSE THEM THE ONLY KIND OF GLOVES I BUY. NO LIE

OFFICER 1: WHY ARE THEY IN, SO NONE OF THAT STUFF, ALL THOSE GLOVES THAT IN THAT BAG YOUR?

ANDERSON: NOT ALL OF THEM THE ONLY PAIR THAT I HAD WAS THE ONES THAT I HAD ON.

OFFICER 1: I MEAN,  WHAT'D YOU HAVE SOME ON FOR?

ANDERSON: LIKE I SAID, WHEN I SMELLED THAT STUFF OUT THERE. WHEN I TRIED TO MOVE THAT STUFF BACK.(INAUDIBLE)

OFFICER 1: SO YOU PUT SOME RUBBER GLOVES ON?

ANDERSON: (INAUDIBLE)

OFFICER 1: SO YOU WORE RUBBER GLOVES WHENEVER YOU WENT OUT THERE. WELL, DID YOU HAVE RUBBER GLOVES ON WHENEVER YOU PUT THE DUCT TAPE ALL AROUND THAT STUFF?

ANDERSON: YEAH

OFFICER 1: YOU DIDN'T WANT IT TO GET ON YOU OR ANYTHING?

ANDERSON: YEAH.

OFFICER 1:  OKAY, PRETTY BAD STUFF AIN'T IT?

40.

ANDERSON: YEAH

OFFICER 1: DID YOU HAVE YOUR MASK ON TO?

ANDERSON: THERE'S A MASK OUT THERE AND I SEEN IT. AND I PICKED IT UP IN THERE.

OFFICER 1: DID YOU USE IT?

ANDERSON: YEAH, HELL YEAH, WHEN I WALKED AROUND THE BUILDING, I,M LIKE WHAT THE FUCK (INAUDIBLE)

OFFICER 1: SO YOU PUT THE MASK ON TOO.

OFFICER 2: DID YOU HAVE YOUR JACKET ON WHEN YOU WENT IN THERE?

ANDERSON: NO, THAT'S NOT MY JACKET MAN.

OFFICER 1: OKAY.

OFFICER 2: WHAT ABOUT THE ICE (INAUDIBLE)

ANDERSON: NO, I DIDN'T PUT THAT ICE THERE.

OFFICER 2: (INAUDIBLE)

ANDERSON: NO, IT SHOULDN'T BE.

OFFICER 2: (INAUDIBLE) IF IT IS IT'S GONNA SHOW. DID YOU TOUCH IT?

ANDERSON: I MOVED THAT JACKET (INAUDIBLE) I DIDN'T TOUCH THE BAG. I DON'T THINK.

OFFICER 2: DID YOU TOUCH THE ICE BAG?

ANDERSON:  YEAH, YEAH, CAUSE I MOVED, CAUSE I GRABBED THAT JACKET CAUSE I WAS TRYING TO GET (INAUDIBLE) THAT SHIT OUT OF HERE MAN.

OFFICER 1: OKAY

ANDERSON: GET THAT SMELL OUT OF THERE. I DIDN'T WANT TO GET HURT OUT THERE.

41.

OFFICER 2: WAS THERE ANYBODY WITH YOU?

ANDERSON: NAW, (INAUDIBLE)

OFFICER 1: YOU BEEN BY YOURSELF HERE THE WHOLE TIME?

ANDERSON: YEAH, I TOLD YOU. I'M HERE, I'M HERE BY MYSELF.

OFFICER 2: OKAY, ALRIGHT. WE'RE GOING TO TRY TO GET THIS STUFF CLEANED UP OKAY. WE'LL TALK TO YOU AGAIN IN A MINUTE.

42.